**COLONIAL REALTY CORPORATION,**
Plaintiff-Appellant,

v.

**BACHE & CO., Defendant-Appellee.**
No. 144, Docket 29868.

United States Court of Appeals
Second Circuit.

Argued Nov. 8, 1965.

Decided March 10, 1966.

Spencer Pinkham, New York City (Colton & Pinkham, New York City), for plaintiff-appellant.

Marvin Schwartz (Sullivan & Cromwell, New York City, Peter R. Fisher, New York City, of counsel), for defendant-appellee.

Before LUMBARD, Chief Judge, and FRIENDLY and SMITH, Circuit Judges.

FRIENDLY, Circuit Judge:

Colonial Realty Corporation, a Delaware corporation with its principal place of business in Pennsylvania, brought this action in the District Court for the Southern District of New York against Bache & Co., a limited partnership organized pursuant to the New York Partnership Law and engaged in securities brokerage in New York City. The controversy arises out of Bache's sales of securities in Colonial's margin account during the stock market dip of May and June 1962. Bache claimed it acted under authority of a clause in its standard form of margin contract in which Colonial covenanted to "maintain such margins as you may from time to time require, upon my accounts, and promptly meet all margin calls." Colonial relied on an alleged oral agreement that Bache would not require a margin in excess of the minimum requirements of the New York Stock Exchange and also claimed negligence on Bache's part. With respect to all securities sold to meet calls exceeding the Stock Exchange's minimum, Colonial sought to recover the losses it had suffered, running into millions of dollars, and some $100,000 in commissions which Bache had collected.[1]

The complaint predicated jurisdiction of the district court on both diversity and the existence of a federal question. Most of the claims were alleged to arise in the first instance from breach of contract or negligence, and in the second from Bache's failure to conduct its dealings in

1. Two claims were variations on the general theme. In one instance Colonial contended that because Bache misinformed it that its margin was below the Stock Exchange's minimum requirements, it sold certain securities to provide additional margin; it sought to recover the difference between the sales price of the securities and their highest intermediate value at a reasonable time thereafter. Another claim alleged an overcharge on debit balances.

a manner "consistent with just and equitable principles of trade" within the meaning of §§ 6(b) and 15A(b) (7) of the Securities Exchange Act of 1934,[2] of Article XIV of the Constitution of the New York Stock Exchange (NYSE), and of Article I, § 2(a) of the By-Laws and Article III, § 1 of the Rules of Fair Practice of the National Association of Securities Dealers, Inc. (NASD). Bache moved for an order dismissing the complaint on the ground that it failed to state any federal claim and there was no diversity of citizenship, or, if that relief were denied, for an order compelling arbitration pursuant to its contract with Colonial and staying the action in the interim.

The district court dismissed the federal claims and, having found diversity, proceeded to hold a hearing to determine the applicability of the arbitration agreement.[3] After the hearing, the judge issued a second order staying the action pending arbitration under the Federal Arbitration Act, 9 U.S.C. § 4, and New York CPLR § 7503; this included a provision amending the prior order which had struck the federal claims so as to grant Colonial leave to request an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Although the stay of what would have been an action at law was appealable under 28 U.S.C. § 1292(a) (1), Shanferoke Coal & Supply Corp. v. Westchester Service Corp., 293 U.S. 449, 55 S. Ct. 313, 79 L.Ed. 583 (1935), and Colonial's appeal therefrom necessarily involved the propriety of dismissal of the federal claims, see fn. 3, we granted leave under § 1292(b) to appeal from that ruling in order to eliminate any doubt as to our ability to reach an issue of general importance under the securities laws.

Colonial's assertion that the complaint alleged a violation of federally granted rights is based upon provisions in the Securities Exchange Act dealing with registration of exchanges and dealers' associations, and upon rules adopted pursuant to the statute by the NYSE and the NASD. Section 6(b) of the Securities Exchange Act provides:

"No registration shall be granted or remain in force unless the rules of the exchange include provision for the expulsion, suspension, or disciplining of a member for conduct or proceeding inconsistent with just and equitable principles of trade, and declare that the willful violation of any provisions of this chapter or any rule or regulation thereunder shall be considered conduct or proceeding inconsistent with just and equitable principles of trade."

Section 15A(b) (8) forbids registration of a national securities association unless:

"the rules of the association are designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to provide safeguards against unreasonable profits or unreasonable rates of commissions or other charges, and, in general, to protect investors and the public interest, * * *."

Under the NYSE Constitution, Art. XIV, § 6, disciplinary measures may be taken against a member found guilty "of conduct or proceeding inconsistent with just and equitable principles of trade"; the NASD By-Laws, Art. I, § 2(a), and Rules of Fair Practice, Art. III, § 1, prohibit membership by persons disciplined on this account and require members to "observe high standards of commercial honor and just and equitable principles of trade." The complaint alleged simply that Bache's dealings were not consistent

---

2. The latter section has subsequently been renumbered § 15A(b) (8), 15 U.S.C. § 78o-3(b) (8).

3. Having already dismissed the claims alleged to arise under federal law, the judge did not have to concern himself further

with Colonial's point that arbitration was not available since its claims arose under the Securities Exchange Act. See Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953). The issue of fact on which the judge conducted the hearing is not pressed on appeal.

with such principles without elaborating how, save insofar as this can be gleaned from the charges of breach of contract and of failure to use due care to protect its customer's interests.

Colonial relies largely on Baird v. Franklin, 141 F.2d 238 (2 Cir.), cert. denied, 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944), in which this court recognized that culpable failure by a stock exchange to enforce rules adopted pursuant to § 6(b) of the Securities Exchange Act may give rise to a federal claim against the exchange by an investor injured thereby. See Brown v. Bullock, 294 F.2d 415, 421 (2 Cir. 1961); Silver v. New York Stock Exchange, 302 F.2d 714, 719 (2 Cir. 1962), rev'd on other grounds, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). Colonial urges that the civil liability thus implied from § 6(b) cannot reasonably be limited to an exchange but must extend to a member firm whose conduct has violated rules adopted by the exchange under the statute; it says that the delinquent broker in the *Baird* case would also have had to be held for an implied federal liability. Although we agree that a federal claim against the member firm existed in *Baird* since the misconduct charged was a violation of the statute itself, see 141 F.2d at 242, this does not establish that implication of a private right of action against an exchange for culpable failure to enforce its rules necessarily calls for recognizing a similar right against an individual broker who is claimed to have violated them.

██ We start from the proposition that the judicial recognition and enforcement of a private remedy not expressly afforded by the Securities Exchange Act is predicated on the duty of the courts "to make effective the congressional purpose" represented in "the statute and the federal policy which it has adopted." J. I. Case Co. v. Borak, 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964). Implication of a private right of action may be suggested by explicit statutory condemnation of certain conduct and a general grant of jurisdiction to enforce liabilities created by the statute, as in

cases under §§ 10 and 14 of the Act, see Fischman v. Raytheon Mfg. Co., 188 F.2d 783 (2 Cir. 1951); J. I. Case Co. v. Borak, supra, or from such considerations as the protection intended by the legislature and the ineffectiveness of existing remedies, administrative and judicial, fully to achieve that end. See Baird v. Franklin, supra, 141 F.2d at 244–245; 2 Loss, Securities Regulation 945 (1961). Whether such a claim can be maintained for violation of stock exchange rules is a thorny problem because the effect and significance of particular rules may vary with the manner of their adoption and their relationship to provisions and purposes of the statute and SEC regulations thereunder; the difficulty lies in the scope of the unique statutory scheme of "supervised self-regulation" by exchanges and dealers' associations. See SEC, Report of Special Study of Securities Markets, H.R.Doc. No. 95, 88th Cong. 1st Sess., Pt. I, 3–4; Pt. 4, 692–728 (1963).

As to matters not covered by the statute or Commission regulations, the exchanges are given a wide range of discretion in establishing standards and principles that should govern trading of securities on the auction market; the mandate of § 6(b) that rules insure observance of "just and equitable principles of trade" could hardly be broader, the only specific requirement being that wilful violation of the statute be condemned. See Silver v. New York Stock Exchange, 373 U.S. 341, 352, 83 S.Ct. 1246, 10 L.Ed. 2d 389 (1963). That Congress did not intend violations of all rules adopted under § 6(b) to give rise to civil claims under federal law is somewhat indicated by the explicit reliance in the section on the disciplinary function of the exchanges to provide protection for the investing public, see Silver v. New York Stock Exchange, supra, 373 U.S. at 371, 83 S.Ct. 1246 (dissenting opinion). Basis for an even broader negation can arguably be found in the absence of any reference to exchange rules in the grant of federal jurisdiction over "all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or

the rules and regulations thereunder," Securities Exchange Act § 27, in contrast to the explicit reference to exchange rules in § 29(a)—although acceptance of this argument would not foreclose a contention that there might still be a federal claim of which district courts would have concurrent jurisdiction under 28 U.S.C. §§ 1331 or 1337. Compare T. B. Harms Co. v. Eliscu, 339 F.2d 823, 828 (2 Cir.), cert. denied, 381 U.S. 915, 85 S.Ct. 1534, 14 L.Ed.2d 435 (1965). In O'Neill v. Maytag, 339 F.2d 764, 770 (2 Cir. 1964), in repudiating a belated attempt to rest federal jurisdiction on a listing agreement between a corporation and the NYSE, this court refused to give general recognition to private rights of action for alleged violations of stock exchange rules.

On the other hand, we cannot ignore that the concept of supervised self-regulation is broad enough to encompass a rule which provides what amounts to a substitute for regulation by the SEC itself. Not content with insisting upon Commission approval of exchange rules as a prerequisite to registration under §§ 6 and 15A, Congress authorized the agency to request modification of particular rules or to promulgate superseding regulations on its own, § 19. A particular stock exchange rule could thus play an integral part in SEC regulation notwithstanding the Commission's decision to take a back-seat role in its promulgation and enforcement, and we would not wish to say that such a rule could not provide the basis for implying a private right of action.[4]

■ What emerges is that whether the courts are to imply federal civil liability for violation of exchange or dealer association rules by a member cannot be determined on the simplistic all-or-nothing basis urged by the two parties; rath-

er, the court must look to the nature of the particular rule and its place in the regulatory scheme, with the party urging the implication of a federal liability carrying a considerably heavier burden of persuasion than when the violation is of the statute or an SEC regulation. The case for implication would be strongest when the rule imposes an explicit duty unknown to the common law. The rules here at issue, however, are near the opposite pole. Although they do impose a duty upon members not to engage in conduct inconsistent with fair and equitable principles of trade, which the exchange or association can enforce through disciplinary proceedings, they are something of a catch-all which, in addition to satisfying the letter of the statute, preserves power to discipline members for a wide variety of misconduct, including merely unethical behavior which Congress could well not have intended to give rise to a legal claim. We find little reason to believe that by requiring exchanges and dealers' associations to include such provisions in their rules Congress meant to impose a new legal standard on members different from that long recognized by state law. See Note, Implying Civil Remedies From Federal Regulatory Statutes, 77 Harv.L.Rev. 285, 292 (1963).

The consequences of the view urged by Colonial would be so disruptive as to require much more impressive evidence of congressional purpose than we can discern. For example, as illustrated by this very case, the widely adopted practice of resorting to arbitration as a means of settling controversies between stockbrokers and their customers would be outlawed whenever the customer chose to rely not on breaches of contract or negligence *simpliciter* but on the more sophisticated theory that the broker's acts were "inconsistent with just and equita-

4. An example of this type of rule is NYSE Rule 452, which prohibits, in certain cases, a member from voting stock held in a street name without specific instructions from the beneficial owner. See Lowenfels, Implied Liabilities Based Upon Stock Exchange Rules, 66 Colum.L.Rev. 12, 25–

28 (1966). The author points out that, doubtless because of the exchange rules, the SEC terminated a rule-making proceeding of its own. See Securities Exchange Act Releases 5166, 20 F.R. 3233 (1955), 5299, 21 F.R. 2636 (1956), 6901, 27 F.R. 9844 (1962).

ble principles of trade," see Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L. Ed. 168 (1953); at least this would be so, if the rule of *Wilko*, decided under the Securities Act of 1933, is applicable also under the Securities Exchange Act of 1934.[5] Moreover, mere recitation of the statutory watchword by an aggrieved investor would saddle the federal courts with garden-variety customer-broker suits, even though the controversy was between citizens of the same state, the sum in question did not attain the jurisdictional amount required by 28 U.S.C. § 1331, and there was no indication that the case would be decided differently under state law—unless we were to make the large assumption that by requiring adoption of rules embodying this phrase Congress meant the federal courts to develop a new body of broker-customer law. Although familiar principles require federal courts to do precisely this as to those exchange rules whose violation is held to create a federal claim, Congress scarcely contemplated judicial creation of a new body of federal broker-customer law whenever the complaint in what would otherwise be an action under state law alleged conduct inconsistent with just and equitable principles of trade. Moreover, if § 27 were read to include exchange rules, the jurisdiction of the federal courts would be exclusive whenever the plaintiff alleged that violation of an exchange rule created a liability or duty created by the Securities Exchange Act and the state courts would be altogether stripped of power to ad-

judicate claims so pleaded even between their own citizens. See Loss, Securities Regulation 996–999, 2005–2006 (1961).[6]

■ Since we thus affirm the decision that the complaint did not state a claim under federal law, we are confronted with Bache's contention that the remaining counts should have been dismissed for lack of diverse citizenship. We may, indeed we must, consider such a challenge to the jurisdiction of the district court, Mitchell v. Maurer, 293 U.S. 237, 244, 55 S.Ct. 162, 79 L.Ed. 338 (1934), even though Bache did not seek leave to appeal from denial of its motion to dismiss.

■ The argument is that a limited partner of Bache & Co. is a citizen of Delaware and that diversity is thereby destroyed under the venerable doctrine of Strawbridge v. Curtiss, 3 Cranch 267, 2 L.Ed. 435 (1806). The district judge recognized that the citizenship of a limited partnership was not sufficiently made out for diversity purposes by alleging the state of its organization, even though state law permitted the partnership to sue or be sued in the firm name. Great Southern Fire Proof Hotel Co. v. Jones, 177 U.S. 449, 20 S.Ct. 690, 44 L.Ed. 842 (1900). But he correctly held that where, as here, there was diversity between the plaintiff and all the general partners of the defendant, identity of citizenship between the plaintiff and a limited partner was not fatal because under the applicable New York statute a limited partner "is not a proper party to proceedings by or against a partnership, except where the object is to enforce a limited

5. Distinction would seem unlikely since § 14 of the 1933 Act, on which the Court relied in *Wilko*, has an almost identical counterpart in § 29(a) of the 1934 Act, which, indeed, specifically refers to "any rule of an exchange."

6. It is true that the implication of a civil claim for violation of § 10 of the Securities Exchange Act and Rule 10b–5 issued thereunder, see Fischman v. Raytheon Mfg. Co., 188 F.2d 783 (2 Cir. 1951), can create similar problems of displacing arbitration and indiscriminately extending federal jurisdiction into preserves traditionally occupied by the states. This interstitial judicial law-making has not es-

caped criticism. See Ruder, Civil Liability Under Rule 10b–5: Judicial Revision of Legislative Intent?, 57 Nw.U.L. Rev. 627 (1963). But there Congress has placed a moderately specific prohibition directly on the defendant and, even though the prohibition in considerable measure tracks the common law, there is more basis for finding a congressional direction for the creation of a specifically federal law than in the case of a broker's alleged violation of a stock exchange commandment vaguely adjuring him to behave himself. Our decision in Brown v. Bullock, 294 F.2d 415, 421 (2 Cir. 1961), is fairly distinguished on similar grounds.

partner's right against or liability to the partnership." N. Y. Partnership Law § 115. In the absence of a claim of insolvency of the partnership, see Klebanow v. New York Produce Exchange, 344 F.2d 294, 298 (2 Cir. 1965);[7] Fuhrmann v. Von Pustau, 126 App.Div. 629, 111 N.Y. S. 34 (1st Dept. 1908), a suit brought against a New York partnership must thus be considered to be against the general partners only and identity of citizenship between a limited partner and the plaintiff does not destoy diversity.

The judgment is in all respects affirmed.

---

**7.** Although the Appellate Division for the First Department, in a 3–2 decision, has declined to validate our prediction in *Klebanow* that New York would allow a limited partner, on a proper showing, to maintain a derivative action, Millard v. Newmark & Co., 24 App.Div.2d 333, 266 N.Y.S.2d 254 (1966), that decision in no way affects the point here made; indeed it would serve to strengthen it.