**PIPER, JAFFRAY & HOPWOOD INCORPORATED, Plaintiff,**

v.

**Jacob H. LADIN et al., Defendants.**

**Civ. No. 73-258-1.**

United States District Court, S. D. Iowa, C. D.

Aug. 26, 1975.

---

8. Deposition of Robert J. Brassell, employee of General Adjustment Bureau, April 26, 1974.

W. Don Brittin, Jr. (Nyemaster, Goode, McLaughlin, Emery & O'Brien), Des Moines, Iowa, for plaintiff.

Lawrence E. Myers, Lee H. Gaudineer, Jr. (Austin, McDonald, Myers, Peterson & Gaudineer), Des Moines, Iowa, for defendants.

## MEMORANDUM OPINION AND ORDER

STUART, District Judge.

Plaintiff, Piper, Jaffray & Hopwood, a stock brokerage corporation having its principal place of business in Minnesota, brought this action against the Mary Schatz and Elaine Ladin Trusts and Jacob H. Ladin, individually as trustee of these two trusts. The plaintiff is seeking to recover a net deficit in the margin accounts established by these two trusts which arose when the trusts failed to meet a margin call arising from the failure of the corporate bonds of Equity Funding Insurance Corporation. Jurisdiction is predicated on 28 U.S.C. § 1332.

On April 15, 1958 Jacob H. Ladin (Ladin) created separate trusts for his daughters, Elaine Ladin and Mary Schatz. He transferred 25 shares of Capital City Woolens Inc., his wholly owned corporation, to each trust. This was later supplemented by a stock dividend of 25 shares of preferred stock paying 6% dividends. Ladin named himself trustee of these two trusts. The trusts remained dormant until August of 1972 when it was arranged for Fred Lorber, a business associate of Ladin's to buy the stock holdings of both of the trusts for $52,000.

Wishing to invest the proceeds of this sale, Ladin contacted Mel Shadur, a registered representative of Piper, Jaffray & Hopwood. After a series of meetings it was decided that each trust would use its $26,000 to make a margin purchase of $35,000 worth of Alabama Power Bonds selling at 107¾ and $35,000 of Equity Funding Bonds at 104⅜. These purchases would leave a slight

cushion in the margin accounts above the 30% minimum capital outlay required for a margin purchase.

The purchase orders were not filled simultaneously and by some mistake or inadvertence the Mary Schatz trust acquired $45,000 worth of Equity Funding Bonds while the Elaine Ladin trust held only $25,000 worth of these bonds when the SEC suspended trading in Equity Funding on or about March 28, 1973. On April 6, 1973 Piper, Jaffray & Hopwood declared Equity Funding securities worthless and issued a margin call in the Mary Schatz trust for $22,416 and in the Elaine Ladin trust for $5,971. Neither margin call was met and the plaintiff is seeking to recover the deficit balance created in each trust account by the margin calls. The defendant trusts are counterclaiming seeking cancellation of these deficit balances and the return of their original investments.

The disposition of defendants' counterclaims will be discussed initially as the resolution the Court makes of these claims makes consideration of plaintiff's claim unnecessary.

### Federal Cause of Action

The trusts claim that Rule 405 of the New York Stock Exchange and Article III § 2 of the Rules of Fair Practice of the National Association of Security Dealers imply a private federal cause of action.

Pursuant to sections 6 and 19 of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78f and 78s) the New York Stock Exchange adopted Rule 405 which provides in pertinent part that:

> Every member organization is required through a general partner or an officer who is a holder of voting stock to (1) use due diligence to learn the essential facts relative to every customer, every order, every cash or margin account accepted or carried by such organization and every person holding power of attorney over any account accepted or carried by such organization.

Under the mandate of § 15(b)(8) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o) the National Association of Security Dealers has promulgated a set of rules which are intended to set forth the standards under which a broker dealer must operate to avoid administrative sanction. One of these promulgations is the so-called "Suitability Rule", Article III, Section 2 of the Rules of Fair Practice of the N.A.S.D. which states:

> In recommending to a customer the purchase, sale, or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs.

The counterclaimant asserts that the plaintiff's agent, Shadur, violated these two rules and such violations impliedly authorize a private cause of action under the Securities Exchange Act of 1934.

Private damage suits for violations of the federal securities acts and the SEC regulations thereunder have been entertained since *J. I. Case Co. v. Borak* (1964), 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423. However, the development of implied federal liability for viations of stock exchange rules did not evolve until the Second Circuit considered the issue in *Colonial Realty Corp. v. Bache and Co.* (2nd Cir., 1966), 358 F. 2d 178.

Securities Exchange Act § 6(b) requires all exchanges to have self-regulatory rules as a prerequisite to registration with the SEC. As Judge Friendly recognized in *Colonial Realty*, the Securities Exchange Act authorizes a private cause of action against a stock exchange for failure to enforce rules adopted pursuant to § 6(b). *Baird v. Franklin* (2d Cir., 1944), 141 F.2d 238. However, it does not necessarily follow that a private right of action exists against an individual broker who is claimed to have violated these rules.

In *Colonial Realty* Judge Friendly found a logical statutory basis for implying private liability for the violation of *some* exchange rules. He noted that a private right of action not expressly afforded by the Securities Exchange Act is predicated upon (1) explicit statutory condemnation of certain conduct, (2) a general grant of jurisdiction to enforce liabilities created by the statute, (3) and a duty of the courts to effectuate the federal policies embodied in the Act. Courts normally consider the protection intended by the legislation and the ineffectiveness of existing remedies administrative and judicial, fully to achieve that end. Therefore, the Court must look to the nature of the particular stock exchange rule and its place in the regulatory scheme, with the party urging implication of federal liability carrying a considerably heavier burden of persuasion than when the violation is of the statute or the SEC regulation. The case for implication is strongest when the rule imposes an explicit duty unknown at common law. 358 F.2d at 181 and 182.

A series of Seventh Circuit cases have also considered the issue of whether a cause of action may be implied for alleged violations of stock exchange rules promulgated pursuant to § 6(b) of the Securities Exchange Act. See *Avern Trust v. Clarke* (7th Cir., 1969), 415 F.2d 1238; *SEC v. First Securities Co. of Chicago* (7th Cir., 1972), 463 F.2d 981. *Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (7th Cir., 1969), 410 F.2d 135, involved an alleged violation of the NYSE Know Your Customer Rule. The Seventh Circuit discussed the *Colonial Realty* analysis in this case but did not rely on the factors considered by Judge Friendly. Instead the Seventh Circuit concluded that whether or not the violation of a particular rule is actionable should properly depend upon its design "for the direct protection of investors". Since one of the functions of Rule 405 is to protect the public, the Court concluded that permitting a private cause of action for its violation was entirely consistent with the purposes of § 6(b). 410 F.2d at 142.

The Seventh Circuit then went on and looked at the conduct of the defendant brokerage company and found it "tantamount to fraud" on the bankrupt brokerage company's customers thus giving rise to a private civil damage action. Thus, in addition to requiring that the stock exchange rule be for the direct protection of investors, *Buttrey* seemingly imposes an additional requirement that the conduct be "tantamount to fraud". It cannot be read to impose liability on a broker for merely unethical or negligent conduct. See MacLean, Broker's Liability for Violation of Exchange or NASD Rules (1970), 47 Denver Law Journal 63.

It is not necessary for the determination of the issue before this Court to decide whether to follow the Second Circuit in *Colonial Realty* or the Seventh Circuit in *Buttrey* as the result under either analysis is the same. The Court in *Buttrey,* 410 F. 2d at 142, did not decide that an alleged violation of Rule 405 was per se actionable. Their decision was based on the additional element of fraudulent conduct. In this case the evidence did not establish that the broker, Mel Shadur, was guilty of any fraudulent action thus under the Seventh Circuit analysis no federal cause of action should be implied.

However, the Court believes that the approach of Judge Friendly in *Colonial Realty* is more in accord with the policy considerations supporting self-regulation of the brokerage industry. See *Landy v. FDIC* (3rd Cir., 1973), 486 F.2d 139, 166. In addition the *Colonial Realty* rule by rule approach allows the determination of federal question jurisdiction to be made without hearing the case on its merits to determine the nature of the conduct giving rise to the alleged violation of the stock exchange rule. This approach thus serves to prevent excessive federal civil actions.

Under the *Colonial Realty* analysis the counterclaimant, Ladin, has not met

his considerably heavier burden of persuasion in demonstrating that the SEC intended that the Suitability Rule or the Know Your Customer Rule were intended to substitute for direct SEC regulation. There is no indication that the SEC contemplated that the stock exchange rules in question were part of a federal scheme to prevent fraudulent practices, *Landy v. FDIC,* supra at 166. In addition the *Colonial Realty* test states that the case for implication is strongest when the rule imposes an explicit duty unknown at common law, 358 F.2d at 182. It is the Court's opinion that the Know Your Customer Rule and the Suitability Rule may form part of the negligence concept in common law, thus clearly falling outside the strongest case for implication of a federal cause of action. *Mercury Investment Co. v. A. G. Edwards & Sons* (S.D.Texas, 1969), 295 F.Supp. 1160). This Court thus concludes that no implied federal cause of action under the Securities Exchange Act has been demonstrated by the counterclaimant and his contention on this issue must fail. See also; Note, Civil Liability for Violations of NASD Rules, *SEC v. First Securities Co.* (1972), 121 U.Pa.L.R. 388; Rediker, Civil Liability of Broker Dealers Under SEC and the NASP Suitability Rules (1969), 22 Ala. L.R. 15.

### Stockbroker's Negligence

In addition to alleging a federal cause of action for violations of the "Know Your Customer Rule" and the "Suitability Rule" the counterclaimant also asserts that the brokerage company was negligent in advising the trustee and handling the financial affairs of the Mary Schatz and Elaine Ladin Trusts. Since jurisdiction of this action is based upon diversity of citizenship and over $10,000 in controversy, 28 U.S.C. § 1332, the dismissal of counterclaimants assertion of implied civil liability under the Securities Exchange Act does not preclude the Court from considering the question of common law negligence.

The record discloses that Ladin, the trustee of the two trusts in question, was a limited trader in the stock market. While he was the former president and present chairman of the board of his own textile manufacturing company, his financial acumen regarding securities transactions was that of an average layperson. He had no previous experience or knowledge concerning the operation of margin accounts.

The evidence established that on August 15, 1972 Ladin mentioned to his long-time golfing friend, Mel Shadur, that he had approximately $50,000 available from the sale of a portion of his business which he wished to invest in high-yield corporate bonds. Shadur, a registered representative of Piper, Jaffray, & Hopwood, told Ladin that he would do some research on various bond issues and "get back to" Ladin. At this meeting he also mentioned to Ladin that he could maximize the income potential of these bonds by purchasing them "on the margin".

On August 23, 1972 Shadur brought a list of several different bonds to Ladin's office. At this meeting the income-maximizing leverage potential of a margin purchase was explained to Ladin, but the risk of greater loss inherent in a margin purchase was not discussed except to the extent that Shadur told Ladin that if the price of the bonds started to drop or if the prime rate went up the bonds could be sold and the margin account paid. Shadur did not explain to Ladin that under certain adverse market circumstances it would be necessary to add additional money to maintain the 30% margin requirements.

At this meeting Shadur also recommended that, of the list of bonds he had prepared, Alabama Power Bonds and Equity Funding Bonds looked like the best investments. Shadur informed Ladin that the Equity Funding Bonds had a "BB" Standard and Poor's rating, but he did not elaborate on this rating, which is "lower medium grade" with

deficit operations possible during poor periods.

At the August 23 meeting Shadur learned that Ladin was purchasing bonds as trustee for the Elaine Ladin and Mary Schatz Trusts. To allow Shadur time to check with his firm's legal department as to the capacity of the trusts to borrow for these margin purchases another meeting was set for August 25, 1972.

At the meeting of August 25 Shadur examined the trust indentures and satisfied himself that the trusts could buy bonds on the margin. This was consistent with the advice he received from the legal department of Piper, Jaffray & Hopwood which had informed Shadur that the trusts could legally effectuate a margin purchase. No effort was made to determine what, if any, other assets the trusts had. Shadur only knew that each of the trusts had approximately $26,000 to invest.

Following Shadur's recommendation, Ladin placed orders to purchase $35,000 of Equity Funding Bonds at 104⅜ and $35,000 of Alabama Power Bonds at 107¾ for each of the two trusts. All of the cost of these bonds above $26,000 per trust represented money borrowed from Piper, Jaffray & Hopwood at a fluctuating interest rate averaging about 1% over the prime interest rate, a typical margin account transaction.

In February of 1973 while Ladin was on vacation, Piper, Jaffray & Hopwood issued a margin call on the Equity Funding Bonds held by the Mary Schatz Trust in the amount of $2004. A business partner of Ladin's, Fred Lorber, advanced his own funds to cover this call. When Ladin returned, he called Shadur and said he wanted Lorber's money back and indicated that there was no more money in the trusts. As this $2004 was necessary to maintain the 30% margin requirement in the Mary Schatz Trust, Shadur returned the $2004 from the Elaine Ladin Trust account without a written authorization or an explanation as to where the money had come from.

A consideration of these facts convinces the Court that Ladin was a relatively unsophisticated investor who relied on Shadur's judgment, knowledge and expertise regarding the securities market. The fact that Shadur initially suggested the margin purchase, did not discuss the degree of risk inherent in the bonds which he recommended, and did not discuss the implications of these facts in relation to each other convinces the Court that Shadur's conduct must be judged according to the generally accepted standards of the stock brokerage industry.

This finding is in accord with the applicable Iowa law which recognizes that the question of the existence of a duty is a matter of law for the court. *Porter v. Iowa Power and Light Co.,* (Iowa, 1974), 217 N.W. 2d 221, 228. In addition, the Iowa Supreme Court has also recognized that the applicable standard of conduct in the practice of a profession is the skill and knowledge normally possessed by members of that profession in good standing in similar communities. *Kastler v. Iowa Methodist Hospital* (Iowa, 1971), 193 N.W.2d 98, 101.

 Both Rule 405 of the NYSE and the NASD Suitability Rule are appropriate indicia of the standard of conduct required of a stock broker in the practice of his profession. This conclusion is consistent with that of *Mercury Investment Co. v. A. G. Edwards and Sons,* supra, 295 F.Supp. at 1163, which found that no federal cause of action existed for violations of the NASD Suitability Rule, but acknowledged that a violation of this rule would be admissible as evidence of negligence. The imposition of a duty to investigate the financial capability of an investor entering a margin transaction and to inform that investor of the implications of a margin purchase can also be justified as part of a stockbroker's professional responsibility. Brokers are required to meet relatively strict requirements in entering their profession and they there-

by gain the advantage and exclusive privilege of trading in the national securities market on behalf of a wide range of investors. See Report of the Special Study of the Securities Market of the SEC, H.R.Doc. No. 95, 88th Cong., 1st Sess., pp. 242–90 (1965). The Court finds a stock exchange broker acting in that capacity owes a duty to the investing public commensurate with professional responsibilities and privileges growing out of this position.

This Court's finding that the NYSE "Know Your Customer Rule" and the NASD "Suitability Rule" are admissible as evidence of negligence is also supported by analogy to the applicable Iowa law regarding private industrial safety codes. The Iowa Supreme Court has recognized that such codes are admissible, but not conclusive, on the issue of negligence. See *Cronk v. Iowa Power and Light Co.* (1965), 258 Iowa 603, 138 N.W.2d 843, 848; *Jorgensen v. Horton* (Iowa, 1973), 206 N.W.2d 100, 103. The stock exchange rules here in question, like the private industrial safety codes, evince a determination by those familiar with the industry that a certain standard of conduct is appropriate even though legislative enactments have not prescribed that conduct; thus making these promulgations admissible as evidence of negligence.

■ The Court finds that Shadur did not comply with the affirmative duty imposed by the Know Your Customer Rule. Shadur did not investigate or inquire as to the financial situation of the two trusts, even though he was on notice that Ladin was acting in his capacity as trustee in this margin transaction. The financial capability of the trusts to purchase on the margin is surely an "essential fact" within the ambit of Rule 405. Shadur did investigate the legal capacity of these trusts to make a margin purchase yet he failed to investigate their financial capacity to absorb the concomitant greater liability which could result from the margin account requirements.

■ ■ The Court also finds that by initiating the idea of a margin purchase and by recommending a Standard and Poors BB corporate bond, without disclosing the liability implications of this margin purchase, Shadur did not comply with the NASD Suitability Rule. The BB rating of Equity Funding Bonds was one step below a BBB rating which is the borderline categorization between definitely sound obligations and those where the speculative element begins to predominate. Thus according to this rating system a BB bond would rank somewhat below a financially secure obligation with a larger speculative element. When this type of margin investment is originally recommended by a broker the broker must disclose the facts necessary to allow the unsophisticated investor to make an informed decision. This duty would increase the flow of information available to the investor and protect against the pressures of high pressure security salesmanship. Investments in margin accounts can be both complicated and technical for the lay investor and brokers typically exert great influence over customer's investment choices. Without disclosure of the facts essential to a margin purchase, a customer may express a preference for a risk which he does not really understand and which he, if fully informed, might not be willing to undertake. On the other hand, if an investor persisted in requesting an unsuitable margin investment, the broker could effectuate the sale provided he discloses the facts essential for the purchaser to make an informed decision.

■ This Court finds that when a relatively unsophisticated buyer seeks investment recommendations from a stock broker and subsequently relies on those recommendations in effectuating a margin purchase, the broker knowing of this reliance owes a duty to disclose the financial implications of the particular margin transaction to the buyer. Shadur's actions in dealing with Ladin and the two trusts breached this duty

making plaintiff liable for any damages incurred by his negligence. The Court also finds that the failure of Equity Funding was not contemplated by either the broker or the investor at the times pertinent to this case and Shadur was not negligent in recommending BB bonds generally or Equity Funding Bonds, specifically.

As provided in *Winter v. Honeggers & Co., Inc.* (Iowa, 1974), 215 N.W.2d 316, an actor's negligent conduct is a legal cause of harm to another if his conduct is a substantial factor in bringing about the harm. The recommendation of the margin purchase of lower grade corporate bonds without full disclosure of the risks inherent in a margin purchase so that the investor could make an informed decision was a substantial factor giving rise to the liability of the two trusts for the margin call after Equity Funding Bonds were declared worthless. See also *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bocock* (S.D.Texas, 1965), 247 F.Supp. 373.

In summary, the Court finds that under all the evidence presented in this case that plaintiff, through the acts of its agent, Shadur, was guilty of common law negligence in the following respects:

(1) In failing to inquire as to the amount of assets in the trusts before recommending a purchase of BB bonds on the margin.

(2) In failing to advise the trustee of the risk of additional financial responsibilities incumbent on a purchaser of BB bonds on a margin account so that an informed decision could be made by the investor.

 The Court also finds that the counterclaimants are not barred by estoppel or waiver arising from any actions of the trustee, Ladin. While Ladin did ratify the initial margin purchase of the Equity Funding Bonds, his actions were taken without disclosure by Shadur of the facts essential to reveal the financial implications of this transaction. The fact that Ladin misconstrued the liability implications of a margin purchase is documented by his demand for a return of the first margin call of $2004. In conjunction with this demand, Ladin stated that there was no more money available in the trusts, indicating that even at this time he did not understand the liability implications of the margin purchase.

### Damages

 The two trusts invested $26,000 to purchase $70,000 worth of Alabama Power Bonds and another $26,000 to purchase $70,000 worth of Equity Funding Bonds. The net balance on each of these transactions above the $26,000 initial investment represented the respective margin account deficits. Since both of the Court's findings of negligence are related to the purchase of Equity Funding Bonds on margin, the Court believes the correct measure of damages is a cancellation of the deficit balance in the margin accounts attributable to Equity Funding Bonds. However, the plaintiff is not responsible to the trusts for the loss of the original $26,000 invested in the Equity Funding Bonds.

An examination of the record reveals that plaintiff reduced the Equity Funding margin account deficit by selling the Alabama Power Bonds and applying the net proceeds of this sale to the Equity Funding deficit. The Court finds that the trusts' investments in the Alabama Power Bonds should not be affected by the Equity Funding transactions. Therefore the trusts are entitled to have the net proceeds of this sale returned to them after the loan by plaintiff or the Alabama Power margin account has been paid and the interest and expenses thereon have been deducted.

After the above steps have been completed, the Equity Funding Bonds which are currently pledged to the plaintiff should be forfeited by the trustee to the plaintiff with the plaintiff acquiring all right, title and interest in and to these bonds. Although this will not allow

the trusts to share in any recovery on the Equity Funding Bonds arising from the Equity Funding receivership, the Court believes the award made is just and fair under all the circumstances.

The parties are in a better position than the Court to determine the exact dollar amounts involved as a result of this decision. The parties are directed to attempt to arrive at an agreement as to the amount due the trusts under this decision and submit a report to the Court within twenty days after the filing of this opinion. If an agreement cannot be reached, this fact should also be reported to the Court within said 20 days and the matter will then be set for hearing.

Judgment will be withheld until such report is received by the Court.