Kenneth C. **NELSON** and Allen W. **Enger, Plaintiffs,**

v.

Nevin F. **HENCH et al., Defendants.**

No. 4–74–Civil 50.

United States District Court, D. Minnesota, Fourth Division.

Feb. 14, 1977.

**414**

James L. Wahlfors, Thomson, Lovett, Wahlfors & Moran, Bloomington, Minn., for plaintiffs.

Donald K. Smith, Smith & Persian, Minneapolis, Minn., for Nevin F. Hench.

Rolf E. Gilbertson, Hall, Joyce & McHaffie, St. Paul, Minn., for Donald L. Anderson.

Lawrence C. Brown, Faegre & Benson, Minneapolis, Minn., for Shearson, Hammill & Co.

## MEMORANDUM AND ORDER FOR JUDGMENT

LARSON, District Judge.

This securities fraud case arose out of an investment arrangement between plaintiffs Kenneth C. Nelson and Allen W. Enger, who had no prior investment experience, and defendant Nevin F. Hench, an acknowledged "con man" who is no stranger to this Court.[1] In the fall of 1970 Hench was introduced to Nelson by Nelson's son Kevin, who had allowed Hench to invest his money in the commodities market and had made some profit. Hench offered to make profits for Nelson as well if he would allow Hench to invest money for him in commodities. Hench intimated that he had a "knack" for making profits in the commodities market and suggested terms by which Nelson could not lose: Hench would make all trading decisions, split any profits in half with Nelson, and make good out of his own pocket any losses he might incur. At the time he made these representations Hench was insolvent, had been convicted of criminal charges arising out of his fraudulently double-mortgaging several classic cars, had outstanding against him a judgment in a civil securities fraud case, and had had only mixed success in the market. Nelson agreed to allow Hench to trade in commodities futures, using Nelson's money, but insisted that the money be placed in a brokerage house account rather than given directly to Hench.

---

1. See *Anderson v. F. I. DuPont & Co.*, 291 F.Supp. 705 (D.Minn.1968).

Hench suggested that the account be handled by an acquaintance, defendant Donald L. Anderson, who was then a registered representative with Walston and Company. Hench had met Anderson years before, when Hench was active in trading for himself, but they never had had a business relationship. Anderson was aware of Hench's various legal troubles, his insolvency, and his uneven performance as an investor, but he did not know of the representations Hench had made to plaintiffs.

Nelson opened an account at Walston with $10,000, and orally instructed Anderson that Hench was to give the orders on the account. Trading commenced in accordance with this unwritten arrangement.

In January 1971 defendant Anderson left Walston and began to work for defendant Shearson, Hayden, Stone & Co. (then known as Shearson, Hammill & Co.). Nelson transferred his account, which at that time showed a profit balance of $3,583.75, to Shearson. At that time plaintiff Enger, Nelson's brother-in-law, joined the venture with $5,000 of his own, opening a separate account at Shearson. Both accounts were traded from January 1971 according to Hench's instructions to Anderson, but Nelson did not sign a Shearson "Customer Margin Agreement" until June 1971, and Hench's authority to trade the accounts was never put in writing.

Hench traded the Nelson and Enger accounts until the beginning of February 1973. In April 1971 he persuaded Nelson to invest an additional $10,000 and Enger an additional $5,000. In both cases the money was needed to cover losses, but Hench represented that it would be used to follow up a "hot tip" on platinum futures. Plaintiffs found out about this particular deception upon receipt of their monthly statements; they continued to allow Hench to trade for them, but deposited no more money in their accounts. They also insisted that Hench sign promissory notes to cover some losses, but Enger has acknowledged that he realized at the time that the notes were probably uncollectible. In July 1971 the losses were so great that plaintiffs called Hench

and Anderson to a "disaster meeting," during which Hench reassured them and promised to make up some of the losses. In June, July, and August 1971 Hench deposited a total of $4,400 in Nelson's account, but he continued to lose considerably more than that for both plaintiffs.

Hoping to recoup some of their losses, plaintiffs allowed Hench to continue trading for them until February 3, 1973. At that time they met with Anderson and withdrew Hench's authority to trade.

After February 3, 1973, Enger, with Nelson's permission, made the trading decisions for both accounts and placed orders with Anderson. The parties dispute whether Enger's short sale orders invariably included a "stop," a limit at which Anderson was to buy in to cut losses in a rising market. Enger says that all orders were placed with a "five-cent stop"—if the market rose by five cents from the sell point, Anderson was to order a buy to cover the sell and limit the loss. Anderson testified that he advised "stops" on all short sales but that Enger did not always place them on orders.

On Friday, March 30, 1973, Enger ordered a short sale of 5,000 bushels of July soybeans at $5.15 per bushel, and the sale was completed at 12:34 p. m. He and Anderson disagree as to whether Enger ordered a five-cent stop on this transaction, but clearly the stop did not actually operate. The market rose to $5.25 by the end of the trading day, 1:00 p. m., without triggering a buy-in for plaintiffs' accounts. On the following Monday, April 2, 1973, Enger called Anderson and was told that the market had risen and the March 30 sell order had not yet been covered. By all accounts, Enger became extremely angry upon hearing that his losses were mounting rapidly. The market had opened at 9:30 a. m. at $5.25, declined to a low of $5.21 at 9:33 a. m., and climbed steadily to reach $5.31½ at approximately 10:36 a. m.; the price remained the same until closing at 1:00 p. m. Enger's call to Anderson on April 2 was placed at about 12:30 p. m. when the price had risen to $5.31½, at which it closed one-half hour later. Enger did not order an immediate

buy-in, but chose, upon Anderson's advice, to "ride the market" in hopes that it would again decline. Instead, it continued to rise to unprecedented highs; Shearson issued a margin call later in the month to cover the sale, and when plaintiffs failed to respond the accounts were sold out. At that time Nelson's account contained $4,725.95 and Enger's $5,073.17.

*Liability of Nevin F. Hench—*

■ Defendant Hench is liable to plaintiffs on grounds of violation of SEC Rule 10b-5, prohibiting manipulative or deceptive devices in connection with the purchase or sale of securities. 17 CFR § 240.10b-5 (1976); 15 U.S.C. § 78r; *Myzel v. Fields,* 386 F.2d 718 (8th Cir. 1967).[2] Hench used the telephone to set up meetings with plaintiffs, and at one of those meetings he represented to Nelson that he would reimburse them for any losses incurred while he traded the account for them. At the time Nelson did not know that Hench was insolvent, and Hench clearly intended that Nelson rely on this false promise. Enger joined the venture on the same terms. In deciding to invest, plaintiffs relied on this guarantee and on Hench's apparent past success in the market, rather than on any belief in his integrity; their insistence on opening the brokerage account indicates an absence of reliance on any implicit or explicit assurance of honesty. Given their lack of investment experience and Hench's own persuasive abilities, plaintiffs' reliance was justifiable. By the time they had reason to believe that Hench did not have a "magic touch" and that he probably could not make good any losses, a total of $30,000 had been placed in the Shearson accounts, and much of that money had been lost through Hench's bad trades. While the losses were immediately attributable to market fluctuations, and Hench did not convert any of it

to his own use, his false guarantee gave him access to the account and his mismanagement contributed to the losses. Both were "substantial factors" in the loss of plaintiffs' money. *Restatement of Torts,* 2d, §§ 431e, 432, 433d, e (ALI, 1965).

*Liability of Donald Anderson—*

A. *Fraud Allegations—*

■ Defendant Anderson did not possess the scienter necessary to a finding of primary liability for a violation of Rule 10b-5, *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). He made no affirmative representations at all, and his nondisclosure of information about Hench's personal and financial background had no bearing on the fraudulent scheme because Anderson did not know about the representations (the guarantee, the intimations of skill) by which the plaintiffs were induced to entrust their investment to Hench's judgment.

■ Plaintiffs have alleged liability on additional grounds of conspiracy to violate, and aiding and abetting a violation of, Rule 10b-5. Anderson cannot be said to have participated in a conspiracy of this sort because there is no evidence of an agreement between him and Hench to defraud plaintiffs. *SEC v. Coffey,* 493 F.2d 1277 at 1304 (6th Cir.), *cert. den.* 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1974). He also is not liable for aiding and abetting because plaintiffs have not established that he had the requisite awareness that the transactions he handled were part of a fraudulent scheme. *SEC v. Coffey, supra.*

■ Plaintiffs also have failed to establish that Anderson by his actions is liable for common law fraud. The misrepresentations upon which plaintiffs relied in allowing Hench to make their investment decisions were not communicated to Anderson;

---

2. In *Ernst & Ernst v. Hochfelder,* 425 U.S. 185 at 193, fn. 10, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court in essence reversed *Myzel v. Fields, supra,* as to its holding regarding the necessity of *scienter* in a 10b-5 action. However, the Court acknowledged that the result of *Myzel* probably was correct in that the

conduct involved amounted to fraud anyway. The *Ernst & Ernst, supra,* opinion has no bearing on the other propositions of securities law discussed in *Myzel v. Fields, supra,* and for those purposes this Court regards it as good law.

his nondisclosure of Hench's background thus cannot be termed "intentional," for he had no reason to believe that the information was significant to plaintiffs, and he therefore could not have had intent to induce plaintiffs' reliance on his nondisclosure. *Hanson v. Ford Motor Co.,* 278 F.2d 586 at 591 (8th Cir. 1960).

Anderson's nondisclosure may, however, be actionable as a matter of negligence, *Hanson, supra,* but even that could not lead to a conclusion of liability, for the nondisclosure of Hench's background cannot be said to have proximately caused the loss. The misrepresentations by which plaintiffs were induced to invest were, specifically, the guarantee that they would not lose any money and the promise that Hench would make a profit for them. His criminal record had no bearing on these representations, and his insolvency was relevant only in regard to the guarantee, of which Anderson knew nothing. Plaintiffs lost money because the market ran against the decisions of their trading agent. Anderson merely placed the orders dictated by that authorized agent. His nondisclosures are not sufficiently connected to plaintiffs' ultimate loss to warrant a conclusion of liability for fraud. *See Royal Realty v. Levin,* 244 Minn. 288, 69 N.W.2d 667 (1955).

#### B. *"Controlling person" liability—*

Plaintiffs' allegation that Anderson is liable as a "controlling person" of Hench under § 20 of the 1934 Exchange Act (15 U.S.C. § 78t(a)) is without merit. While the Eighth Circuit has endorsed a broad interpretation of the term, *Myzel v. Fields, supra,* at 738, even that interpretation does not encompass the circumstances of this case. Anderson did not have any "means of discipline or influence" over Hench. *Myzel v. Fields, supra.* He did not personally provide Hench with direct access to the trading process, and he was not in a position to prevent Hench from trading by cutting off access. *Anderson v. F. I. DuPont & Co.,* 291 F.Supp. 705, at 710 (D.Minn. 1968). Plaintiffs themselves were responsible for Hench's access through their clear authorization, and only they could terminate that authorization.

#### C. *The stop-order dispute—*

Defendant Anderson's failure to place the stop on the March 30, 1973, order for short sale of 5,000 bushels of July beans constituted a breach of his agreement with Enger to place orders for the Nelson and Enger accounts according to Enger's direction. Anderson therefore is liable for the resulting loss. That loss must be measured, however, in light of plaintiffs' duty to mitigate damages. *Costello v. Johnson,* 265 Minn. 204 at 208, 121 N.W.2d 70 (1963). Enger knew that the market had risen above the desired stop point when he found out on April 2 at 12:30 p. m. that the stop had not been placed. He could have bought in to cover the short sale on the same day, but instead he chose to "ride the market" in hopes that it would fall again. Anderson is responsible for the loss only in the amount that accrued prior to 12:30 p. m. on April 2, 1973.

### Liabilities of Shearson, Hayden, Stone & Co.—

#### A. *"Controlling person" liability—*

Because defendant Anderson is not liable for a violation of any provision of or rule promulgated under the 1934 Exchange Act, the question of Shearson's liability as a "controlling person" under § 20 of the Act need not be discussed. Plaintiffs' contention that Shearson was a "controlling person" of Hench must fail for reasons stated in the discussion of Anderson's liabilities.

#### B. *NYSE Rule 405, NASD Rule 27—*

Plaintiffs allege that defendant Shearson is liable to them because the firm acted contrary to the "know your customer" rules of the National Association of Securities Dealers (NASD) and the New York Stock Exchange (NYSE). NYSE Rule 405 requires that a member firm "diligently" supervise all transactions and follow a screening procedure by which every cash or margin account opened, and every power of

attorney accepted by the firm, must be approved by a general partner or officer of the firm who has "diligently" investigated the customer or the third party trading the account. NASD Rule 27 requires member dealers to establish written procedures to ensure that registered representatives and accounts are properly supervised to prevent irregularities and violations of the securities laws.[3] The Court finds without difficulty that Shearson violated Rule 405, because proper supervision and review would have uncovered the fact that a third party, whose background would have warranted disapproval of him as a trader, was in fact giving the trading orders on two customer accounts. Despite Shearson's compliance with the dictates of Rule 27 as to establishing supervisory procedures, it has violated that provision as well by failing to enforce its own house rules and NYSE Rule 408,

requiring representatives to obtain a written power of attorney on third party accounts.[4] The question, then, is whether these violations of industry-promulgated rules give rise to a private remedy.

This issue has arisen in a number of cases in recent years, and the courts have dealt with it in varying ways. In *Buttrey v. Merrill Lynch, Pierce, Fenner & Smith,* 410 F.2d 135 (7th Cir.), *cert. den.* 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88 (1969), the Seventh Circuit held that a violation of NYSE Rule 405 could give rise to a private civil action where the conduct alleged was "tantamount to fraud," *Buttrey, supra,* at 143. In 1972 a district court within that circuit held that a violation of Rule 405 was not actionable where the plaintiffs could not allege actual fraud in addition to the rule violation. *McMaster Hutchinson and Co. v. Rothschild & Co.,* CCH Federal Securities

**3.** The portions of the rules alluded to read as follows:

*NYSE Rule 405*

Every member organization is required through a general partner or an officer who is a holder of voting stock to

(1) Use due diligence to learn the essential facts relative to every customer, every order, every cash or margin account accepted or carried by such organization and every person holding power of attorney over any account accepted or carried by such organizations.

Supervision of Accounts

(2) Supervise diligently all accounts handled by registered representatives of the organization.

Approval of Accounts

(3) Specifically approve the opening of an account prior to or promptly after the completion of any transaction for the account of or with a customer, provided, however, that in the case of branch offices, the opening of an account for a customer may be approved by the manager of such branch office but the action of such branch office manager shall within a reasonable time be approved by a general partner . . . . .

*NASD Rule 27*

Written procedures

(a) Each member shall establish, maintain and enforce written procedures which will enable it to supervise properly the activities of each registered representative and associated person to assure compliance with applicable securities laws, rules, regulations and statements of policy promulgated thereunder and with the rules of this Association.

Responsibility of member

(b) Final responsibility for proper supervision shall rest with the member. The member shall designate a partner, officer or manager in each office of supervisory jurisdiction, including the main office, to carry out the written supervisory procedures. A copy of such procedures shall be kept in each such office.

Written approval

(c) Each member shall be responsible for keeping and preserving appropriate records for carrying out the member's supervisory procedures. Each member shall review and endorse in writing, on an internal record, all transactions and all correspondence of its registered representatives pertaining to the solicitation or execution of any securities transaction.

Review of activities and annual inspection

(d) Each member shall review the activities of each office, which shall include the periodic examination of customer accounts to detect and prevent irregularities or abuses and at least an annual inspection of each office of supervisory jurisdiction.

**4.** Plaintiffs have not based a liability claim on NYSE Rule 408, but they have suggested that all the Hench transactions might have been unauthorized because Anderson failed to require a written power of attorney according to the rule. Hench's authority to trade was properly established orally. *See Ocrant v. Dean Witter & Co., Inc.,* 502 F.2d 854 at 858 (10th Cir. 1974).

Law Reports, 1972–73 Transfer Binder ¶ 93,541 (N.D.Ill. Feb. 15, 1972).

The *Buttrey* standard for determining whether a rule violation gives rise to a private cause of action has been rejected, for good reason, by many of the courts that have considered the question. If the facts alleged must be "tantamount to fraud" by the standards of the forum State, which would include negligent or "innocent" misrepresentation, then plaintiffs could assert a Federal cause of action on grounds that have been rejected explicitly by the Supreme Court in *Ernst & Ernst v. Hochfelder, supra.* The "tantamount to fraud" requirement makes the determination concerning the private right of action depend upon individual conduct rather than upon the nature of the rule in question, with the legally illogical result that violation of the same rule would not consistently give rise to a cause of action. *See Zagari v. Dean Witter & Co., Inc.,* 1976 CCH Fed.Sec.L. Repts. ¶ 95,777 (N.D.Ill. Sept. 27, 1976). Courts have also expressed concern that application of the *Buttrey* standard would cause excessive litigation because a determination of the facts regarding fraud would be required before subject matter jurisdiction could be determined with certainty. *See Piper Jaffray & Hopwood, Inc. v. Ladin,* 399 F.Supp. 292 (S.D. Iowa 1975); *Lange v. Hentz & Co.,* 418 F.Supp. 1376 (N.D.Tex.1976).

A better method for analyzing this question was suggested by Judge Friendly in *Colonial Realty v. Bache & Co.,* 358 F.2d 178 (2d Cir. 1965), *cert. den.* 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966). The appropriateness of Judge Friendly's approach was implicitly confirmed recently by the Supreme Court in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), in which the Court in a different context enumerated the factors it deemed relevant to a determination of whether a private remedy may be implied from a statute.

In *Colonial Realty, supra,* the issues included implication of a private remedy from both NYSE and NASD rules. Concluding that such questions should be decided on a case-by-case basis, Judge Friendly stated that:

> "the court must look to the nature of the rule and its place in the regulatory scheme, with the party urging the implication of a federal liability carrying a considerably heavier burden of persuasion than when the violation is of the statute or an SEC regulation. The case for implication would be strongest when the rule imposes an explicit duty unknown to the common law." *Colonial Realty, supra,* at 182.

*Place of the Rules in the Regulatory Scheme—*

Plaintiffs here have argued that the rules in question were enacted for the benefit of the public and as such must give members of the public a right to recover for injury caused by acts in violation of those rules. This Court is convinced, however, that the rules requiring broker-dealers to closely supervise their accounts and know the background of their customers must have been enacted primarily for the protection of the dealers. While a broker-dealer should be concerned for the welfare of the customer as a matter of ethics, the firm as a matter of economics is concerned first with discouraging actions by individual representatives that might give rise to legal liability. It also is interested in the ability of its customers to meet their financial obligations. *See* P. Hoblin, Jr., "A Stock Broker's Implied Liability to Its Customer for Violation of a Rule of a Registered Stock Exchange," 39 Fordham Law Review 253 at 266 (1970). While plaintiffs correctly claim that the fraud on them involved rule violations, they cannot establish to the satisfaction of the Court that the protection of investors from unscrupulous third party traders was more than an incidental motive for enactment of these rules. *See Zagari, supra,* at p. 90,811.

The Court remains unconvinced as well of the proposition that these rules are integral to the legislative scheme so as to give rise to a cause of action. In § 27 of the 1934 Act the Federal courts are given exclusive

jurisdiction of cases arising under the Act "or the rules or regulations thereunder." 15 U.S.C. § 78aa. Where Congress intends to include rules of exchanges or associations within a statutory mandate, it does so explicitly, as in § 29(a) of the 1934 Act, 15 U.S.C. § 78cc(a), and it has not done so here; clearly Congress did not contemplate causes of action arising under rules promulgated by exchanges or dealer associations. Moreover, the implication of such rights of action is diametrically opposite to the concept of self-regulation that is essential to the regulatory scheme and purpose of the 1934 Act, *Silver v. NYSE*, 373 U.S. 341 at 352, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); the industry may well hesitate to establish any rules at all if its attempts to define ethical and economic limits readily give rise to legal liability. *See Landy v. FDIC*, 486 F.2d 139 at 166 (3d Cir.), cert. den. 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 1312 (1973).

■ All of the factors discussed here, comprising what has come to be known as the *Colonial Realty* "substitution test," militate against a conclusion that the rules in question form the basis of a private remedy. Plaintiffs cannot establish any form of SEC activity that would suggest agency acknowledgment of NYSE Rule 405 and NASD Rule 27 as recognized substitutes for agency rules. Therefore the Exchange and Association rules do not carry the force of Federal law. *See Colonial Realty, supra*, at 182; *Zagari, supra*, at p. 90,810.

*Explicit Duty Unknown to the Common Law—*

■ The rules at issue here describe a duty of broker-dealers to supervise accounts and, to some extent, prescribe the procedures by which the duty is performed. In essence, the NYSE and NASD have incorporated into their rules one standard by which defendant firms' duty could be measured in a negligence action; violation of rules is evidence of negligence toward customers. Such rules do not, however, draw the contours of a right for which no remedy currently exists under recognized principles of common law. The Court therefore has

no reason to create a new right of action. *Piper, Jaffray & Hopwood v. Ladin, supra; Colonial Realty, supra; Mercury Investment Co. v. A. G. Edwards & Sons*, 295 F.Supp. 1160 at 1163 (S.D.Tex.1969).

C. *Agency Liability—*

■ Shearson is liable, as the principal for whom Anderson acted within the scope of his employment, for the "stop-order" loss incurred through Anderson's breach of contractual duty towards the customers Enger and Nelson. *Restatement of Agency, Second,* § 144 (ALI 1958).

IV. *Damages—*

■ According to the "out-of-pocket" rule followed in this circuit, plaintiffs in a securities fraud action may recover only the amount with which they were induced to part, rather than lost profits of an enterprise built on a fraud. *Myzel v. Fields, supra.* The same rule applies as to common law fraud. *Lehman v. Hansord Pontiac*, 246 Minn. 1, 74 N.W.2d 305 (1955). Plaintiff Enger was induced to deposit a total of $20,000 in the brokerage house accounts on which Hench traded. Plaintiff Nelson was induced to deposit $10,000.

■ Enger claims as additional damages $3,583.75, profit balance on the Walston account at the time the funds were transferred to the Shearson account. This sum was not in any sense a new investment, but a paper profit; like any other amount in excess of the original investment that appeared on the monthly statement and was lost through reinvestment, it is not recoverable. *General Corp. v. General Motors Corp.*, 184 F.Supp. 231 (D.Minn.1960).

■ Plaintiffs can be said to have been victims of fraud only to the extent that they justifiably relied on material misrepresentations made with intent to induce their reliance. By July 1971 plaintiffs knew that Hench could not produce the promised return on their investment, and his tendency to talk fast and tell little truth had become apparent through the April "platinum futures" fiasco. Plaintiffs are reasonably in-

telligent, careful people, and Enger's testimony indicated that he possesses a good deal of business sense. By July 31, 1971, plaintiffs could no longer justifiably rely on any representations, past or future, made by Hench. The loss resulting from the fraud therefore must be measured as of that date, when the Nelson account contained $1,068.45 and the Enger account $2,554.67. Nelson's damages are $18,931.55 and Enger's $7,445.33.

Plaintiffs are entitled to damages, subject to mitigation, on their contractual claim against Anderson and his principal, Shearson. If the stop order had been placed, plaintiffs would have bought in 5,000 bushels of July beans at $5.20, reached on March 30, 1973. If they had properly mitigated by buying in when the error was discovered, they would have bought in at $5.31½ (the price from 10:36 to closing on April 2, 1973, the date the error was discovered). Accordingly, each is entitled to $575.00 in damages.

 Plaintiffs have requested prejudgment interest on all claims. Under the standard applicable in Minnesota, prejudgment interest may be awarded only on liquidated claims or on those unliquidated claims in which damages may be ascertained readily by computation or by reference to a clear standard such as market value. *Potter v. Hartzell Propeller, Inc.,* 291 Minn. 513 at 518, 189 N.W.2d 499 (1971). Plaintiffs' claims against Hench were not readily ascertainable because at the time the cause of action arose it yet remained for the Court to determine when the fraud terminated, and the monthly balance in the accounts varied so that the damages could not be fixed until the termination of the fraud was established. As to the claim against Anderson, the date upon which the loss is determined, and the point at which the duty to mitigate is enforceable, are matters which the parties cannot determine for themselves, but which rest with the jury, or, in this case, the Court. Because Anderson could not know until after trial the amount due plaintiffs, so as to offer an acceptable settlement earlier, the Court

does not award prejudgment interest against him either. *Moosebrugger v. McGraw-Edison Co.,* 284 Minn. 143 at 161, 170 N.W.2d 72 (1969).

This opinion shall constitute the Findings of Fact and Conclusions of Law in this case.

IT IS ADJUDGED:

1. That defendant Nevin F. Hench is liable in damages to plaintiff Kenneth C. Nelson in the amount of $18,931.55.

2. That defendant Nevin F. Hench is liable in damages to plaintiff Allen W. Enger in the amount of $7,445.33.

3. That defendant Shearson, Hayden, Stone & Co. and defendant Donald L. Anderson are liable in damages to plaintiff Kenneth C. Nelson in the amount of $575.00.

4. That defendant Shearson, Hayden, Stone & Co. and defendant Donald L. Anderson are liable in damages to plaintiff Allen W. Enger in the amount of $575.00.

Let Judgment be entered accordingly.