CARLSBERG RESOURCES CORPORATION, a corporation, trading as Carlsberg Mobile Home Properties, Ltd.—72, a limited partnership, Appellant,

v.

CAMBRIA SAVINGS AND LOAN ASSOCIATION, a State Savings and Loan Association, William P. Deemer, an Individual, Anne H. Henderson, an Individual, Forest Enterprises, Inc., a corporation, George B. Henderson, an Individual, and Ronald N. Eller, an Individual, trading as Forest Park, a general partnership.

No. 76–1945.

United States Court of Appeals, Third Circuit.

Argued Feb. 22, 1977.

Decided May 4, 1977.

---

Milton W. Lamproplos, Ray C. Stoner, James H. Roberts, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., for appellant.

Robert F. Hawk, Butler, Pa., for appellee Cambria Sav. and Loan Ass'n.

John T. Richards, Jr., Richards & Kelly, Pittsburgh, Pa., for appellees Anne H. and George B. Henderson.

Irwin B. Wedner, Goldberg & Wedner, Pittsburgh, Pa., for appellees Forest Enterprises, Inc. and Ronald N. Eller.

Jerome M. Libenson, Baskin, Boreman, Wilner, Sachs, Gondelman & Craig, Pittsburgh, Pa., for appellee William P. Deemer.

Before BIGGS, ADAMS and HUNTER, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

This case poses an intriguing problem concerning the diversity jurisdiction of the federal courts. Specifically we must ascertain whether an identity of citizenship between a number of limited partners of a plaintiff partnership and the defendants precludes an exercise of diversity jurisdiction.[1]

### I.

The present lawsuit was initiated on behalf of Carlsberg Mobile Home Properties, Ltd.—'72, a partnership, by Carlsberg Resources Corporation, the sole general partner in such partnership. Basically, the plaintiff seeks damages from defendant Cambria Savings and Loan Association for alleged negligence in the manner in which Cambria disbursed construction loans to the developers of a trailer park. Damages also are claimed because the other defendants, the developers, purportedly conspired to procure loan proceeds prior to the schedule contemplated in the loan program, funds that the developers would be unable to repay. As a result of a chain of events set into motion by the alleged improprieties, the trailer park property, owned by the plaintiff partnership but subject to a priority mortgage held by Cambria, was sold at a foreclosure sale.

Subsequent to the inception of the litigation, the district court directed that Carlsberg produce documents listing its limited partners and their addresses. These materials revealed that some of the limited partners and all of the defendants were citizens of Pennsylvania. By contrast, the sole general partner, Resources, was a California corporation. Because of the identity of citizenship between Carlsberg's limited partners who reside in Pennsylvania and the defendants, the trial judge dismissed the complaint for want of diversity jurisdiction.[2]

The present appeal then ensued.

### II.

At the onset of our inquiry, we note that the defendants themselves did not raise the issue of diversity jurisdiction during the proceedings in the district court. Consonant with such a posture, defendant Cambria maintains on appeal, as does the Carlsberg partnership, that the trial judge erred when he dismissed the action for a lack of jurisdiction.[3]

---

1. Insofar as we are aware, the subject at hand has escaped the attention of the commentators. And only few courts have considered the issue. *See Colonial Realty Corp. v. Bache & Company,* 358 F.2d 178 (2d Cir.), *cert. denied,* 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966) and cases cited in note 22 *infra.* A discussion of *Colonial Realty* appears in Part IV of this opinion.

2. The opinion of the district court is reported at 413 F.Supp. 880 (W.D.Pa.1976).

3. When the trial judge dismissed the action for lack of diversity jurisdiction, he indicated that, should it be determined on appeal that such jurisdiction does exist, he would rule that Carlsberg failed to state a claim against defendant Cambria. 413 F.Supp. 884–86. At this

■ Despite the failure of any party to address the question of jurisdiction, the district court properly confronted such matter *sua sponte*. And this Court should refuse to accede to any attempt by litigants, collusive or otherwise, to waive a jurisdictional defect on appeal. This is so because the federal courts are without power to adjudicate the substantive claims in a lawsuit, absent a firm bedrock of jurisdiction. When the foundation of federal authority is, in a particular instance, open to question, it is incumbent upon the courts to resolve such doubts, one way or the other, before proceeding to a disposition of the merits.

In so stating, we take heed of the admonitions of both the Supreme Court and this Court on previous occasions. For example, in *Thomas v. Board of Trustees*,[4] the Supreme Court declared:

"It is . . . well established that when jurisdiction depends upon diverse citizenship the absence of sufficient averments or of facts in the record showing such required diversity of citizenship is fatal and cannot be overlooked by the court, even if the parties fail to call attention to the defect, or consent that it may be waived."[5]

Likewise, Judge Biggs, writing for a unanimous panel, stated in *Underwood v. Maloney*:[6] "the issue of jurisdiction is always open and should be determined *in limine* by a trial court." It follows that this Court should not circumvent jurisdictional problems such as are present in the case at bar, merely because parties urge that we do so.

The theoretical underpinnings of the precept that a prime duty of the federal courts is to address any jurisdictional issues are not difficult to perceive. Without the resolution of such questions, federal judges may conduct protracted litigations which are not properly before them and which ultimately may be dismissed summarily by a reviewing tribunal for lack of the requisite jurisdictional predicate. Not only may an improper exercise of judicial authority by the federal courts, in contravention of constitutional and statutory dictates, disrupt the carefully crafted and balanced system of federalism designed by the framers of the Constitution, but unnecessary proceedings would certainly require the expenditure of valuable judicial resources as well. Given these considerations, it is not surprising that jurisdictional issues should be dealt with as promptly and as carefully as possible.

In our view, the concerns of judicial economy and of due respect for the principles of federalism are most apposite where, as here, matters of diversity jurisdiction are implicated.[7] To ignore the constitutional and statutory strictures regarding such jurisdiction would impose additional burdens on a federal judicial system which already strains to process cases that are necessarily lodged with it. Relaxation of diversity requirements, intentional or otherwise, inevitably will increase access to the federal courts by litigants now confined to state courts, thereby augmenting the volume of business of the federal tribunals. Such an occurrence also may postpone or even forestall the vindication of the rights of liti-

point, Cambria does not dispute the jurisdiction of the federal courts, preferring instead to obtain a favorable disposition on the merits. *See* Letter of Robert F. Hawk, Attorney for Cambria, to this Court, dated January 24, 1977. The rationale for this appellate strategy is quite evident: an adjudication on the merits could be employed by Cambria as a defense to a lawsuit that already has been initiated by Carlsberg in the state courts, a lawsuit which, we understand, tenders the same allegations as its counterpart in the federal courts.

It should be noted that the defendants other than Cambria did not file briefs on appeal, but merely adopted the opinion of the district court as reflective of their position.

4. 195 U.S. 207, 25 S.Ct. 24, 49 L.Ed. 160 (1904).

5. *Id.* at 211, 25 S.Ct. at 25.

6. 256 F.2d 334 (3d Cir.), *cert. denied*, 358 U.S. 864, 79 S.Ct. 93, 3 L.Ed.2d 97 (1958).

7. *Cf.* American Law Institute, Study of Division of Jurisdiction Between State and Federal Courts 99–110 (1969).

gants—criminal and civil—who are properly in the federal courts.[8]

Even more serious would be the disservice rendered to the cardinal precepts of federalism should judges abdicate their responsibility to determine whether diversity truly exists whenever such jurisdiction in invoked. By its very nature, the diversity jurisdiction of the federal courts interferes with the autonomy of state tribunals by diverting litigation, ordinarily handled by such courts, to federal forums.[9] Although the rule of Erie R.R. v. Tompkins,[10] requiring that state law be applied in diversity cases, operates to ameliorate the dislocative impact of such diversion, the fact remains that diversity jurisdiction prevents the states from adjudicating and resolving important matters that they otherwise would handle. Since conflict resolution constitutes one of the core public functions of state government,[11] the exercise of diversity jurisdiction necessarily encroaches, in some fashion, on the ability of the states to engage in this traditional activity.

These considerations of judicial economy and federalism lead inescapably to two factors which may serve to frame our inquiry here. We already have made reference to the first—namely, that the federal courts should resolve any questions that they may have as to the existence of diversity jurisdiction before proceeding to a decision on the merits. The second factor derives quite naturally from the above discussion: that federal tribunals should be demanding in evaluating whether diversity jurisdiction subsists. In view of the possibly deleterious consequences of a failure to adhere meticulously to the constitutional and statutory standards governing diversity jurisdiction, access to the federal courts, on the ground of the diverse citizenship of the parties, should be granted only where clearly appropriate and only to the extent, if at all, that is justified. Such an approach necessitates that diversity jurisdiction cannot be exercised, unless there has been a definitive determination that diversity of citizenship is present.[12]

With these thoughts in mind, we proceed to the precise jurisdictional issue at hand.

### III.

Resolution of the specific question whether an identity of citizenship between a number of the limited partners of a plaintiff partnership and the defendants destroys diversity jurisdiction would appear to rest upon the interplay between two well-established tenets regarding such jurisdiction.

The first of these is the rule delineated in Strawbridge v. Curtiss.[13] In that landmark case, several of the plaintiffs were citizens of Massachusetts, as were a number of the

---

**8.** The Supreme Court and Congress have been sensitive to the burdens placed on the federal courts by diversity jurisdiction. In City of Indianapolis v. Chase National Bank, 314 U.S. 63, 62 S.Ct. 15, 86 L.Ed. 47 (1941), for example, the Court noted:

"The dominant note in the successive enactments of Congress relating to diversity jurisdiction is one . . . of relieving the federal courts of the overwhelming burden of 'business that intrinsically belongs to the state courts,' in order to keep them free for their distinctive federal business."

Id. at 76, 62 S.Ct. at 20.

**9.** See id. at 76–77, 62 S.Ct. 15.

**10.** 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

**11.** See Parks et al. v. "Mr. Ford" d/b/a Ford's Speed Shop et al., 556 F.2d 132 at 146 (3d Cir. 1977) (Adams, J., concurring).

**12.** In so stating, we would appear to be in accord with McSparran v. Weist, 402 F.2d 867 (3d Cir. 1968), cert. denied sub nom. Fritzinger v. Weist, 395 U.S. 903, 89 S.Ct. 1739, 23 L.Ed.2d 217 (1969) wherein this Court said:

" 'when [an] inquiry involves the jurisdiction of a federal court—the presumption in every stage of a cause [is] * * * that it is without the jurisdiction of a court of the United States. . . .' This is particularly true in diversity [cases] . . . ."

Id. at 876, quoting Lehigh Mining & Mfg. Co. v. Kelley, 160 U.S. 327, 336–337, 16 S.Ct. 307, 40 L.Ed. 444 (1895) and Miller & Lux v. East Side Canal Co., 211 U.S. 293, 302, 29 S.Ct. 111, 53 L.Ed. 189 (1908).

**13.** 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806).

defendants. Construing the statutory precursor to the modern diversity statute (28 U.S.C. § 1332), the Supreme Court sustained a dismissal of the complaint for want of diversity jurisdiction.

Although the language of the opinion may be somewhat abstruse,[14] for almost two centuries *Strawbridge* has stood for the proposition that, for diversity jurisdiction to attach, all parties on one side of a litigation must be of a different citizenship from all of those on the other. Put another way, the Court formulated the precept that complete diversity is required between all parties opposed in interest, if jurisdiction is to obtain. And it would seem to follow that the dismissal of the present lawsuit for lack of jurisdiction should be sustained, unless the parties can demonstrate that they possess the requisite diverse citizenship.

The second principle which bears on our inquiry concerns the traditional treatment of partnerships and other unincorporated associations, at least for purposes of diversity jurisdiction. In an extended line of cases, the Supreme Court has consistently held that, where noncorporate entities—including partnerships—are concerned, the courts should look to the citizenship of the persons comprising such organizations in order to determine whether there is compliance with the diversity standard.[15] In effect, an unincorporated association has been viewed as a citizen of each state in which it has a member.

A precedent quite pertinent here is *Great Southern Fire Proof Hotel Co. v. Jones.*[16]

In that case, a limited partnership initiated, in federal court, a lawsuit seeking to recover amounts owed to it under a contract. Although the partnership maintained that it should be treated, for jurisdictional purposes, as a citizen of the state whose laws had authorized its creation, the Supreme Court rejected this contention. Instead, the Court ruled that the citizenship of the partnership was the "citizenship of the several persons composing such association."[17] Moreover, it rejected the argument that a state-created right enabling a partnership to sue and be sued in the name of the partnership makes that entity, for diversity purposes, a citizen of the state creating it. *Southern Fire* thus seems to teach that, in dealing with partnerships, limited and otherwise, we should look to the citizenship of the members of the partnership to determine whether diversity of citizenship exists.

It should be noted that *Southern Fire* deals with a problem somewhat different from that at bar. That case did not involve a factual matrix in which there were partners of differing classes, since all of the partners were of a "limited" status. Even so, the rule devised in *Southern Fire*, as to the treatment of partnerships and other noncorporate enterprises, may well apply in a situation such as the one here.

*Chapman v. Barney,*[18] a case decided before *Southern Fire* involved a factual setting somewhat more akin to the present one. In *Chapman*, a joint stock company, which was called a "mere partnership" by

---

**14.** The *Strawbridge* Court stated in pertinent part:

"The words of the act of Congress are, 'where an alien is a party; or the suit is between a citizen of a state where the suit is brought, and a citizen of another state.' The court understands these expressions to mean, that each distinct interest should be represented by persons, all of whom are entitled to sue, or may be sued, in the federal courts."

*Id.* at 267.

While the Court refers to "entitlement" to sue, as we read the opinion, it appears to be speaking only to "entitlement" based upon the requisite citizenship mandated by the diversity statute.

**15.** *E. g., United Steelworkers of America v. R. H. Bouligny, Inc.,* 382 U.S. 145, 86 S.Ct. 272, 15 L.Ed.2d 217 (1965); *Thomas v. Board of Trustees,* 195 U.S. 207, 25 S.Ct. 24, 49 L.Ed. 160 (1904); *Great Southern Fire Proof Hotel Co. v. Jones,* 177 U.S. 449, 20 S.Ct. 690, 44 L.Ed. 842 (1900); *Chapman v. Barney,* 129 U.S. 677, 9 S.Ct. 426, 32 L.Ed. 800 (1889).

**16.** 177 U.S. 449, 20 S.Ct. 690, 44 L.Ed. 842 (1900).

**17.** *Id.* at 456, 20 S.Ct. at 693.

**18.** 129 U.S. 677, 9 S.Ct. 426, 32 L.Ed. 800 (1889).

the Supreme Court,[19] sought to bring an action in the federal courts. Under the laws of New York, as extant in that period, such an unincorporated association was authorized to bring suit in the name of its president. Although the joint stock company claimed that it was a citizen of New York, and while its president was a citizen of the same state, whereas the defendant was a citizen of Illinois, the Court refused to rule that diversity existed. Indicating that the citizenship of association members is determinative as to whether diversity jurisdiction obtains, the *Chapman* Court remanded the case so that the citizenship of such members, other than that of the president, could be determined.

Implicit in the opinion in *Chapman* may be a refusal by the Supreme Court to differentiate between classes of association or partnership members regarding questions of diversity. In that case, there were in essence, two such classes—one consisting of the president, a member with capacity to sue by virtue of state law, and another comprised of all other partners in the enterprise. Despite such class distinctions as well as an apparent difference in the capacity of each class to sue, the *Chapman* Court suggested that the citizenship of all association members still must be considered in order to resolve the jurisdictional question. It would appear that such consideration also is mandatory in the litigation now before us, where there are two classes of partners—a single general partner and a large class of limited members.

The Supreme Court has continued to adhere to the treatment of noncorporate enterprises that *Southern Fire* and *Chapman* mandate. In *United Steelworkers of America v. R. H. Bouligny, Inc.*,[20] the Court reaffirmed the proposition that the citizenship of an unincorporated association, for at least jurisdictional purposes, is deemed to be that of each of its members. Equally significant is the fact that *Bouligny*, while recognizing that the jurisdictional treat-

ment of noncorporate entities deserved reconsideration, declared that such a determination fell within the province of Congress.[21] In so doing, the Supreme Court took a rather hard line, demanding that existing principles respecting diversity jurisdiction be strictly followed.

When the rule of complete diversity is read in conjunction with the principle that the citizenship of a partnership depends upon that of its members, it becomes clear that diversity jurisdiction may not obtain here, unless *all* of the members of the plaintiff partnership are of distinct citizenship from all of the defendants. Since such diversity in citizenship is lacking, the district court properly dismissed the complaint for want of jurisdiction.

In so stating, we recognize that the three leading Supreme Court cases in this area, which have been discussed above, do not squarely address the exact question posed here—in effect, whether partners of divergent status may be treated differently for purposes of an evaluation regarding diversity of citizenship. Yet *Chapman* does appear to have indicated, albeit only implicitly, that considerations of varying membership status should not bear on the fundamental inquiry whether diversity exists. More importantly, when heed is paid the postulate of diversity analysis presented in Part II—that access to the federal courts on the ground of diversity should be denied absent a clear entitlement to such access—it becomes clear that this Court should conclude that diversity is lacking here. To do otherwise would constitute an extension of such jurisdiction to hitherto uncovered broad categories of litigants, with the resultant detriment to judicial economy and our system of federalism.

## IV.

While Carlsberg and Cambria do not disagree with much of our discussion in Part

---

**19.** *Id.* at 682, 9 S.Ct. 426.

**20.** 382 U.S. 145, 86 S.Ct. 272, 15 L.Ed.2d 217 (1965).

**21.** *Id.* at 147, 150, 86 S.Ct. 272.

III, they contest its application to the present litigation. For they maintain that there is an exception to the traditional jurisdictional treatment of unincorporated associations—namely, that a suit brought by or against a limited partnership may be viewed as implicating solely the general partners so that an identity of citizenship between a party on one side and a limited partner on the other cannot destroy diversity.

The source of the alleged exception is *Colonial Realty Corp. v. Bache & Company*,[22] a Second Circuit opinion by Judge Friendly. There the court posited that an identity of citizenship between a limited member of a partnership on one side and a party on the other does not vitiate diversity jurisdiction, so long as there is diversity between all of the general partners and the opposing party.

Unfortunately, *Colonial Realty* contains little analysis of the question before us—in large part, because that case primarily focused on other issues. Even so, the rationale for the proposition that only the citizenship of general partners is relevant with respect to determinations as to diversity jurisdiction is easily grasped. Basically, the decision in *Colonial Realty* rested on New York law pertaining to the capacity to sue

and be sued of limited partners. Under such law, a limited partner is "not a proper party to proceedings by or against a partnership . . . ."[23] Apparently, the Second Circuit reasoned that a limited partner should not be "counted" for diversity purposes if such individual himself has no capacity to sue or be sued on behalf of the partnership.

Nonetheless, we are unable, for several reasons, to accede to the teachings of *Colonial Realty*, or to apply them in this litigation.

In the first place, we are troubled by the readiness with which *Colonial Realty* engrafts capacity-to-sue rules to the traditional requirements of diversity jurisdiction. As we view it, jurisdiction is the *most* elemental concern of the federal courts in evaluating the cases which come before them. By contrast, issues pertaining to the capacity to sue, while hardly lacking in significance, are deserving of consideration only after the jurisdiction of the federal court has been firmly established. It may be for this reason that the Supreme Court has, in the leading cases concerning partnerships and other nonincorporated associations, declined to view problems involving diversity jurisdiction through the perspective of capacity to sue.[24]

**22.** 358 F.2d 178 (2d Cir.) *cert. denied*, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966).

At least two district courts have followed *Colonial Realty* in their treatment of limited partnerships as to diversity jurisdiction. *C. P. Robinson Construction Co. v. Nat'l Corp. for Housing Partnerships*, 375 F.Supp. 446 (M.D.N.C.1974); *Erving v. Virginia Squires Basketball Club*, 349 F.Supp. 709 (E.D.N.Y.1972).

**23.** N.Y. Partnership Law § 115, *quoted in* 358 F.2d at 183–84.

**24.** *See* cases cited in note 12, *supra*, and the discussion thereof in text accompanying notes 13–18, *supra*. *See also* 3A Moore's Federal Practice, ¶ 17.25, at 862–69 (1976).

This Court likewise has indicated, in a variety of contexts, that diversity jurisdiction and capacity to sue are distinct problems. *See, e. g., McSparran v. Weist*, 402 F.2d 867, 870 (3d Cir. 1968), *cert. denied sub nom. Fritzinger v. Weist*, 395 U.S. 903, 89 S.Ct. 1739, 23 L.Ed.2d 217 (1969); *Underwood v. Maloney*, 256 F.2d 334, 338, 341 (3d Cir.), *cert. denied*, 358 U.S. 864, 79 S.Ct. 93, 3 L.Ed.2d 97 (1958).

In *McSparran*, a case which raised the question whether diversity jurisdiction could be created by the appointment of a nonresident guardian for the estate of a minor, this Court declared [402 F.2d at 870]:

We are not here concerned . . . with capacity to sue under Rule 17, nor with the question whether the fiduciary is the real party in interest. Our problem is whether for purposes of diversity jurisdiction we should look to the citizenship of the representative, here the guardian of the estate of a minor, or to the person on whose behalf he acts.

Even more apposite to the present controversy is the following statement in *Underwood* [256 F.2d at 338]:

[U]nder Rule 17(b) an unincorporated association must sue or be sued as an entity in the United States District Court for the Eastern District of Pennsylvania.

Jurisdiction nonetheless must be established and for jurisdictional purposes the citizenship of an unincorporated association is determined by the citizenship of its members.

Presumably, the Second Circuit looked to New York law because of the mandate in Rule 17(b).[25] Such rule provides, in pertinent part, that: "capacity to sue or be sued shall be determined by the law of the state in which the district court is held  . . ." In *Colonial Realty*, as here, reference to the pertinent state law provisions revealed that the limited partners had no capacity to sue,[26] and so, goes the argument, these partners should not be considered for purposes of adjudicating diversity.

Assuming that *Colonial Realty* was relying, at least in part, on Rule 17 for authority to look to state law to resolve the jurisdictional matter before the court, we believe that such reference may run afoul of the mandate of Rule 82.[27] This provision instructs that the "rules [of civil procedure] shall not be construed to extend or limit the jurisdiction of the United States district courts  . . . ." To import state law concepts of capacity to sue into evaluations of jurisdiction, explicitly or implicitly under Rule 17, would appear to have a definite effect on jurisdiction. Specifically, to ignore an identity of citizenship between limited partners and litigants with opposing interests, because of reliance on state statutes concerning the capacity to sue, does operate to liberalize access to the federal courts under diversity jurisdiction. It would seem to follow that Rule 82 bars the utilization of Rule 17 in this context.

Even if the Second Circuit did not employ Rule 17 as its basis for adverting to state law, we still would deem such reference, for the limited purpose of jurisdiction, to be somewhat disturbing. One ramification of the *Colonial Realty* approach is to empower state legislators or state courts to determine the perimeters of federal jurisdiction.

If, for example, a state wished to narrow the access of limited partnerships to diversity jurisdiction, it could enact legislation granting limited partners the capacity to sue or be sued on behalf of their partnerships. Under *Colonial Realty*, such action by a state would make it more difficult for limited partnerships, or opposing parties, to gain a federal forum. The opposite result would obtain, of course, if the state restricted the capacity to sue or be sued of members—general and limited—of partnerships. For, then, litigants would find it more facile to surmount those requirements which tend to limit diversity jurisdiction.

In our view, it would not be advisable to adopt the *Colonial Realty* rule. For to do so seemingly would make diversity jurisdiction, in situations such as the one at hand, largely dependent upon the vagaries of state law. Also troubling would be the prospect of disparate treatment of litigants whose ability to vindicate their interests in federal court, under the diversity provisions, would be equally dependent upon state law. Availability of diversity jurisdiction, we believe, ordinarily should not rest upon considerations of state law but rather upon uniform and readily cognizable principles of general application.

We also are inclined to diverge from *Colonial Realty* because of the absence of a directive from the Supreme Court. There is no suggestion in its opinions that the citizenship of limited partners should be largely ignored for diversity purposes. Indeed, as noted earlier, the Court may have rendered indications to the contrary in those opinions which have discussed jurisdictional questions relating to partnerships. Without instructions from the Court that

---

**25.** Fed.R.Civ.P. 17(b).

**26.** The New York statute pertinent in *Colonial Realty* [N.Y. Partnership Law § 115] derives from § 26 of the Uniform Limited Partnership Act, as does 59 Pa.C.S.A. § 545, the provision which seems to be relevant to the case at hand. Section 545 provides, in part: "A contributor [*i. e.*, limited partner], unless he is general partner, is not a proper party to proceedings by or against a partnership  . . . "

California, the only other state whose law on this subject may bear on our inquiry here, also has adopted § 26 of the Uniform Act. Calif. Corp. Code § 15526. Reference to the California provision may be necessary should another segment of Rule 17(b) be deemed apposite here: "The capacity of an individual, other than one acting in a representative capacity, to sue or be sued shall be determined by the law of his domicile."

**27.** Fed.R.Civ.P. 82.

an identity of citizenship between a limited partner and opposing litigants does not destroy diversity, we are most reluctant to carve out an exception to the complete diversity standard and the traditional treatment of partnerships with respect to diversity jurisdiction.

Our position in this regard is further fortified because there is no indication whatsoever that the draftsmen of 28 U.S.C. § 1332 desired that limited partners be handled as suggested in *Colonial Realty.* To the contrary, as we read the diversity provision and the leading cases construing it, it is apparent that Congress wished to afford the benefits of diversity jurisdiction to litigants only where the statutory requirements have been complied with in strict fashion. Consequently, it cannot be said that Congress intended to permit diversity jurisdiction to attach in instances such as the present one.

As a final point, we can discern no convincing policy rationales for adopting the formulation of *Colonial Realty.* Rather, there are substantial reasons which militate against such adoption. The two primary policy concerns are those discussed at the inception of our analysis and which have served to inform our inquiry—judicial econ-

omy and federalism.[28] Since these factors instruct that access to the federal courts, on the ground of diverse citizenship, should be denied unless clearly appropriate, we cannot conclude that the district court committed error when it dismissed the complaint for lack of jurisdiction.[29]

## V.

Accordingly, the dismissal of the complaint by the district court, for want of diversity jurisdiction, will be affirmed.[30]

JAMES HUNTER, III, Circuit Judge, dissenting:

The issue in this case—whether the citizenship of limited partners should be "counted" when a limited partnership sues or is sued in a diversity action—has never before been examined in depth. The Second Circuit, in *Colonial Realty Corp. v. Bache & Co.,* 358 F.2d 178 (2d Cir.), *cert. denied,* 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966) (*per* Friendly, J.), is the only court of appeals even to have addressed the question.[1] Commentators have ignored it entirely. Yet the implications of our answer to the problem may be far-reaching indeed: all the states and the Virgin Islands have adopted the Uniform Limited Partnership

---

**28.** See Part II of this opinion.

**29.** We recognize that the decision reached today may have the consequence of foreclosing some limited partnerships from a federal forum. Nonetheless, as the Supreme Court has suggested in a related context, petitions for relief from the requirements of diversity jurisdiction should be addressed not to the courts but to the legislative branch of government. *United Steelworkers of America v. R. H. Bouligny, Inc.,* 382 U.S. 145, 147, 150–53, 86 S.Ct. 272, 15 L.Ed.2d 217 (1965).

**30.** When a complaint must be dismissed for lack of diversity jurisdiction, the federal courts have, of course, no power to consider the merits of a plaintiff's claims.

**1.** In spite of the majority's characterization of the opinion, the *Colonial Realty* court did more than assume that limited partners' citizenship need not be considered:

> [The district judge] *correctly held that* where, as here, there was diversity between the plaintiff and all the general partners of the defendant, *identity of citizenship between the*

> plaintiff and a limited partner was not fatal because under the applicable New York statute a limited partner "is not a proper party to proceedings by or against a partnership, except where the object is to enforce a limited partner's right against or liability to the partnership." In the absence of a claim of insolvency of the partnership, *a suit brought against a New York partnership must thus be considered to be against the general partners only and identity of citizenship between a limited partner and the plaintiff does not destroy diversity.*

358 F.2d at 183–84 (citations omitted) (emphasis added).

That this was not some oversight is supported by a subsequent reference, by the Second Circuit, in *Woodward v. D. H. Overmyer Co.,* 428 F.2d 880 (2d Cir. 1970), *cert. denied,* 400 U.S. 993, 91 S.Ct. 460, 27 L.Ed.2d 441 (1971), where the court did consider the citizenship of each partner in a *general* partnership, and contrasted *Colonial Realty* as dealing with a limited partnership. *Id.* at 883.

Act,[2] and, if the majority's view were to prevail, limited partnerships would effectively be foreclosed from federal diversity forums.[3] Because I believe the majority's analysis and result are incorrect, and because the dearth of other decisions on point means that this case may form the starting point for other courts' analyses of the problem, I must respectfully dissent.

I agree with the majority, of course, that federal courts must have jurisdiction to act and that they should refrain from attempting to increase their own jurisdiction. Nonetheless, federal courts still have jurisdiction in diversity cases,[4] and whatever the effect on our docket, I see no responsible alternative but to apply diversity standards in this case.

The majority and I do diverge in our conceptions of a unique business entity, the limited partnership. The majority groups limited partnerships together with general partnerships, while I believe it more appropriate to treat them as peculiar and distinct entities.

2. 6 Uniform Laws Annotated (Supp.1977 at 83).

3. For instance, the Carlsberg Mobile Home Properties limited partnership has some 1500 limited partners, across the country.

4. See Chief Justice Burger's announcement that the Judicial Conference of the United States will recommend to Congress that diversity jurisdiction be abolished, reported in Public Information Office of the United States Supreme Court release of March 11, 1977.

5. The majority implies that the Supreme Court has followed this approach, *see* majority opinion, footnote 24 and accompanying text, but I read those cases as referring to an entirely different argument—to wit, that an organization need not be afforded "entity" status for diversity purposes merely because state law allows the organization to be pleaded as a party. Here, on the other hand, there is no issue of "entity" status. We are asked only which persons composing the group are to be counted for diversity purposes.

6. As the majority opinion indicates, in its footnote 24, capacity to sue is a separate problem from that of determining diversity jurisdiction. Nevertheless, capacity to sue—as dictated by state law—generally selects the proper parties, for diversity purposes.

In a general partnership, each partner is jointly and equally responsible for the organization's affairs. Each can sue on behalf of the partnership. Thus when a general partnership brings suit in federal court, alleging diversity jurisdiction, the court turns to state law and determines that each partner is jointly liable and responsible; therefore, each must be "counted" for diversity purposes.

In assimilating the treatment of limited partnerships to that of general partnerships, the majority applies this analysis in what we consider to be reverse order. According to the majority view, the court must examine the parties' citizenship as a preliminary issue, and only then does capacity to sue become relevant.[5] I fail to see, though, how a court knows whose citizenship to count without first determining who the parties are. By "parties" I mean real parties, those who have the capacity to bring suit, and in some cases where the categories diverge, those who are the real parties in interest.[6] No one can examine citizenship *in vacuo*.

In *McSparran v. Weist*, 402 F.2d 867 (3d Cir. 1968), *cert. denied sub nom. Fritzinger v. Weist*, 395 U.S. 903, 89 S.Ct. 1739, 23 L.Ed.2d 217 (1969), the court had to consider an exception to its rule that the party who has the capacity to sue, under state law, is the one whose citizenship will be determinative for diversity, a rule set out in *Fallat v. Gouran*, 220 F.2d 325 (3d Cir. 1955), *discussed in* 6 C. Wright and A. Miller, *Federal Practice and Procedure* § 1566 (1971). The exception in *McSparran* was "a naked arrangement for the selection of an out-of-state guardian in order to prosecute a diversity suit." 402 F.2d at 875. Relying on 28 U.S.C. § 1359, this court held the guardian collusively joined, and not the real party in interest. *See id.* at 874 ("since he is acting in the capacity of a straw party we refuse to recognize his citizenship for purposes of determining diversity jurisdiction"). Thus the court looked to the citizenship of the minor, the real party in interest, for diversity citizenship. *Fallat* was disapproved only to the extent that it indicated approval of "manufactured" diversity. 402 F.2d at 876.

In the other case, *Underwood v. Maloney*, 256 F.2d 334 (3d Cir.), *cert. denied*, 358 U.S. 864, 79 S.Ct. 93, 3 L.Ed.2d 97 (1958), this court clearly followed state law as required by Fed.R. Civ.P. 17(b):

In actions brought in a United States district court where jurisdiction is based on diversi-

Because limited partnerships are unique, albeit popular, creatures of (uniform) state law, I do not see how we can ignore the state law that shapes them. We must use state law on members' rights and responsibilities before we can rationally decide whom to "count" for diversity. *Cf. Miller v. Perry*, 456 F.2d 63 (4th Cir. 1972) (deciding that administrator under state law is merely a nominal plaintiff); *Bishop v. Hendricks*, 495 F.2d 289 (4th Cir.), *cert. denied*, 419 U.S. 1056, 95 S.Ct. 639, 42 L.Ed.2d 653 (1974) (same). Thus I am not troubled, as the majority purports to be, by Judge Friendly's decision in *Colonial Realty, supra*, to engraft "capacity-to-sue rules to the traditional requirements of diversity jurisdiction." Indeed, I can envision no other sensible way to proceed.

The Supreme Court has not even touched upon the topic. Although cases cited by the majority are venerable, they are not relevant. The argument rejected by the Court in *Great Southern Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 20 S.Ct. 690, 44 L.Ed. 842 (1900), was that a partnership should be given a separate "entity" status, apart from its individual members, for diversity. Moreover, the partnership, although denom-

inated a limited partnership, was not the modern limited partnership, but was one where all the members had the same status. The Court rightly held that each member should be counted.[7]

Even as recently as *United Steelworkers of America v. R. H. Bouligny, Inc.*, 382 U.S. 145, 86 S.Ct. 272, 15 L.Ed.2d 217 (1965), the only argument before the Court has been an "entity" argument. In *Bouligny*, the Court rejected the argument that, for diversity, a labor union could be treated as a "citizen." The difficulties were legion: the Court would have to fashion, out of whole cloth, a test for ascertaining of which state the labor union, *qua* entity, would be a citizen; the local and national organization would complicate the matter. In sum, the Court felt such decisions better undertaken by the legislative branch.

Here we have no such problems. Just as with general partnerships it was state law that informed us to count each member's citizenship, here, too, it is state law that informs us of the nature of these uniform limited partnerships and tells us we should look only to the general partners, since it is the general partners who function as ordi-

---

ty, the capacity of persons to sue or be sued is determined by the law of the state in which the district court sits.

*Id.* at 341. State law in that diversity case would allow labor unions to sue or be sued only as an entity, not as a class. Thus the federal court could not allow a class suit; when examined as an "entity" for diversity purposes, each member's citizenship had to be considered, just as in *United Steelworkers of America v. R. H. Bouligny, Inc.*, 382 U.S. 145, 86 S.Ct. 272, 15 L.Ed.2d 217 (1965). We followed state law:

In states where an unincorporated association can neither sue nor be sued as a class, it necessarily follows that the individual members of an association lack the capacity to sue or to be sued as class representatives of the unincorporated association.

*Id.* at 342. No argument was made that state law would differentiate among the members, giving only some the capacity to sue.

7. *Chapman v. Barney*, 129 U.S. 677, 9 S.Ct. 426, 32 L.Ed. 800 (1889) also faced, and rejected, an "entity" argument. Nowhere did the Court indicate, as the majority suggests, that an argument had been made that only the president's citizenship should be considered. The entire discussion is as follows:

On looking into the record we find no satisfactory showing as to the citizenship of the plaintiff. The allegation of the amended petition is, that the United States Express Company is a joint stock company organized under a law of the State of New York, and is a citizen of that State. But the express company cannot be a *citizen* of New York, within the meaning of the statutes regulating jurisdiction, unless it be a corporation. The allegation that the company was *organized* under the laws of New York is not an allegation that it is a corporation. In fact, the allegation is, that the company is *not* a corporation, but a joint-stock company—that is, a mere partnership. And, although it may be authorized by the laws of the State of New York to bring suit in the name of its president, that fact cannot give the company power, *by that name*, to sue in a Federal court.

*Id.* at 682, 9 S.Ct. at 428 (final emphasis added). Thus, the Court did not consider an argument that because state law gave only the president the capacity to sue, only the president's citizenship should matter. The rights and liabilities of the members were not an issue.

nary partners—the limited partners are a distinct breed.

The purpose of limited partnerships is to allow some contributors of capital to be given a fixed return on their investment without having any voice in the management of the business.[8] In return, the limited contributors are protected from the unlimited liability general partners face. As the Official Comments to section one of the Uniform Limited Partnership Act make clear:

> . . . [T]he person who contributes the capital, though in accordance with custom [is] called a limited partner, *is not in any sense a partner.* He is, however, a member of the association.

(Emphasis added).

In keeping with their restricted role, limited partners cannot take part in the management of the business,[9] and cannot be included in a suit by or against the partnership. Section 26, adopted nationwide, provides:

> A contributor, unless he is a general partner, is not a proper party to proceedings by or against a partnership, except where the object is to enforce a limited partner's right against or liability to the partnership.

From time to time a limited partner has attempted to sue on behalf of the partnership. The general rule, however, works against them: the suits are dismissed,[10] or the limited partner is deprived of his or her limited liability.[11] Thus, the majority would have us take cognizance, for diversity purposes, of persons who, under state law, are clearly prohibited from taking part in a suit by or against the partnership. This, to me, appeals neither to logic nor to common sense.

I do not view an approach that will consider the unique nature of partnerships created under the Uniform Limited Partnership Act as an approach that will empower state legislators or courts to determine the perimeters of federal court jurisdiction. On a less grand scale, that "power" is familiar in, for example, cases where state law allows appointment of out-of-state executors.[12] In that case, an executor can easily be chosen with diversity jurisdiction in mind. If so, the federal court has appropriate safeguards against "manufactured" jurisdiction.[13] Here, it takes some imagina-

---

8. The idea is not new. The Uniform Act is based largely on New York's limited partnership statute adopted in 1822. That in turn derived from the French Societe en Commandite whose origins may in turn date back to 1166. *See generally* 65 Colum.L.Rev. 1463 (1965).

Interestingly enough, the civil commandite prototype was given entity status for diversity purposes by the Supreme Court in *Puerto Rico v. Russell & Co.*, 288 U.S. 476, 53 S.Ct. 447, 77 L.Ed. 903 (1933). In *Bouligny* the Court refers to this as a problem of "fitting an exotic creation of the civil law, the *sociedad en comandita*, into a federal scheme which knew it not." 382 U.S. at 151, 86 S.Ct. at 275.

9. Uniform Limited Partnership Act § 7. In fact, the name of a limited partner cannot appear in the partnership name. Uniform Act § 5.

10. *See, e.g., Riviera Congress Associates v. Yassky*, 25 A.D.2d 291, 268 N.Y.S.2d 854, *aff'd*, 18 N.Y.2d 540, 277 N.Y.S.2d 386, 223 N.E.2d 876 (1966), where the limited partners first instituted the suit in the partnership name, thus exposing each of them to general liability. To avoid that, they changed the caption to include the names of the limited partners, as a class action. But the court held that to be a violation of section 26, saying "[t]he action could not thereafter be maintained." 25 A.D.2d at 296, 268 N.Y.S.2d at 859.

On appeal, the New York Court of Appeals faced the increasingly problematical issue of limited partners' rights when the general partners wrongfully refuse to bring suit. New York has authorized derivative suits in those instances. *See Riviera, supra*, 277 N.Y.S.2d at 391, 223 N.E.2d at 879. That procedure has been adopted by the New York legislature, as well as by Delaware, and is a 1976 proposed revision to the Uniform Limited Partnership Act. If such derivative suit were brought in diversity, then it might be appropriate to look at the citizenship of the limited partners. But that is not our case today.

11. *See e.g., Bedolla v. Logan & Frazer*, 52 Cal. App.3d 118, 128, 125 Cal.Rptr. 59, 66 (1975) (general rule that limited partner cannot sue without becoming liable as a general partner).

12. *See* footnote 5 *supra*.

13. *Id.*

tion to believe that limited partnerships would be created in deliberate anticipation of a need for diversity jurisdiction. But even if that did occur, the federal courts are equipped to deal with it, under 28 U.S.C. § 1359. *Cf. Kramer v. Caribbean Mills*, 394 U.S. 823, 89 S.Ct. 1487, 23 L.Ed.2d 9 (1969) (application of 28 U.S.C. § 1359 to collusive assignment).

Last, but certainly not least, the policies behind the congressional grant of diversity jurisdiction [14] are well served by allowing these limited partnerships access to federal courts when all the general partners are diverse in citizenship from all the opposing parties. They are to the limited partnership what general partners are to traditional partnerships. If the latter are allowed to sue in diversity, the former should be, too.

I do not see this as carving out an exception to the traditional treatment of partnerships. These are not traditional partnerships, and I prefer to treat them as the distinct creatures they are. Thus, I respectfully dissent.

---

**14.** I refer in particular to the assurance of impartiality to out-of-state litigants.